420 F.2d 1225
 2 Fair Empl.Prac.Cas. 310, 2 Empl. Prac. Dec.
P 10,143
Willie S. GRIGGS, James S. Tucker, Herman Martin, William C.
Purcell, Clarence M. Jackson, Robert A. Jumper, Lewis H.
Harrison, Jr., Willie Boyd, Junior Blackstop, John D.
Hatchett, Clarence Purcell, Eddie Galloway, and Eddie
Broadnax, Appellants,
v.
DUKE POWER COMPANY, a corporation, Appellee.
 No. 13013.
 United States Court of Appeals Fourth Circuit.
 Argued April 10, 1969.
Decided Jan. 9, 1970.
 
 Jack Greenberg, New York City (Conrad O. Pearson, Durham, N.C., J. LeVonne Chambers, Chambers, Stein, Ferguson & Lanning, Charlotte, N.C., Sammie Chess, Jr., High Point, N.C., James M. Nabrit, III, Norman C. Amaker, Robert Belton, Garbrielle A. Kirk, George Cooper, and Albert J. Rosenthal, New York City, on brief) for appellants.
 George W. Ferguson, Jr., Charlotte, N.C. (Carl Horn, Jr., and William I. Ward, Jr., Charlotte, N.C., on brief) for appellee.
 Russell Specter, Asst. Gen. Counsel, Equal Employment Opportunity Commission, and Gary J. Greenberg, Atty., Dept. of Justice (Daniel Steiner, Gen. Counsel, Philip B. Sklover, Atty., Equal Employment Ooprtunity Commission, Jerris Leonard, Asst. Atty. Gen., and Carol R. Aronoff, Atty., Dept. of Justice, on brief) for amicus curiae.
 Before SOBELOFF, BOREMAN and BRYAN, Circuit Judges.
 BOREMAN, Circuit Judge:
 
 
 1
 Present Negro employees of the Dan River Steam Station of Duke Power Company in Draper, North Carolina, in a class action with the class defined as themselves and those Negro employees who subsequently may be employed at the Dan River Steam Station and all Negroes who may hereafter seek employment at the station, appeal from a judgment of the district court dismissing their complaint brought under Title VII of the Civil Rights Act of 1964. (Duke Power Company will be referred to sometimes as Duke or the company.) The plaintiffs challenge the validity of the company's promotion and transfer system, which involves the use of general intelligence and mechanical ability tests, alleging racial discrimination and denial of equal opportunity to advance into jobs classified above the menial laborer category.
 
 
 2
 Duke is a corporation engaged in the generation, transmission and distribution of electric power to the general public in North Carolina and South Carolina. At the time this action was instituted, Duke had 95 employees at its Dan River Station, fourteen of whom were Negroes, thirteen of whom are plaintiffs in this action. The work force at Dan River is divided for operational purposes into five main departments: (1) Operations; (2) Maintenance; (3) Laboratory and Test; (4) Coal Handling; and (5) Labor. The positions of Watchman, Clerk and Storekeeper are in a miscellaneous category.
 
 
 3
 The employees in the Operations Department are responsible for the operation of the station's generating equipment, such as boilers, turbines, auxiliary and control equipment, and the electrical substation. They handle also interconnections between the station, the company's power system, and the systems of other power companies.
 
 
 4
 The Maintenance Department is responsible for maintenance of all the mechanical and electrical equipment and machinery in the plant.
 
 
 5
 Technicians working in the Laboratory Department analyze water to determine its fitness for use in the boilers and run analyses of coal samples to ascertain the quality of the coal for use as fuel in the power station. Test Department personnel are responsible for the performance of the station by maintaining the accuracy of instruments, gauges and control devices.
 
 
 6
 Employees in the Coal Handling Department unload, weigh, sample, crush, and transport coal received from the mines. In so doing, they operate diesel and electrical equipment, bulldozers, conveyor belts, crushers and other heavy equipment items. They must be able to read and understand manuals relating to such machinery and equipment.
 
 
 7
 The Labor Department provides service to all other departments and is responsible generally for the janitorial services in the plant. Its employees mix mortar, collect garbage, help construct forms, clean bolts, and provide the necessary labor involved in performing other miscellaneous jobs. The Labor Department is the lowest paid, with a maximum wage of $1.565 per hour, which is less than the minimum of $1.705 per hour paid to any other employee in the plant. Maximum wages paid to employees in other departments range from $3.18 per hour to $3.65 per hour.
 
 
 8
 Within each department specialized job classifications exist, and these classifications constitute a line of progression for purposes of employee advancement. Promotions within departments are made at Dan River as vacancies occur. Normally, the senior man in the classification directly below that in which the vacancy occurs will be promoted, if qualified to perform the job. Training for promotions within departments is not formalized, as employees are given on the-job training within departments. In transferring from one department to another, an employee usually goes in at the entry level; however, at Dan River an employees is potentially able to move into another department above the entry level, depending on his qualifications.
 
 
 9
 In 1955, approximately nine years prior to the passage of the Civil Rights Act of 1964 and some eleven years prior to the institution of this action, Duke Power initiated a new policy as to hiring and advancement; a high school education or its equivalent was thenceforth required for all new employees, except as to those in the Labor Department. The new policy also required an incumbent employee to have a high school education or its equivalent before he could be considered for advancement from the Labor Department or the position of Watchman into Coal Handling, Operations or Maintenance or for advancement from Coal Handling into Operations or Maintenance. The company claims that this policy was instituted because it realized that its business was becoming more complex and that there were some employees who were unable to adjust to the increasingly more complicated work requirements and thus unable to advance through the company's lines of progression.
 
 
 10
 The company subsequently amended its promotion and transfer requirements by providing that an employee who was on the company payroll prior to September 1, 1965, and who did not have a high school education or its equivalent, could become eligible for transfer or promotion from Coal Handling, Watchman or Labor positions into Operating, Maintenance or other higher classified jobs by taking and passing two tests, known as the Wonderlic general intelligence test and the Bennett Mechanical AA general mechanical test, with scores equivalent to those achieved by an average high school graduate. The company admits that this change was made in response to requests from employees in Coal Handling for a means of escape from that department but the same opportunity was also provided for employees in the Labor Department.
 
 
 11
 Until 1966, no Negro had ever held a position at Dan River in any department other than the Labor Department. On August 6, 1966, more than a year after July 2, 1965, the effective date of the Civil Rights Act of 1964, the first Negro was promoted out of the Labor Department, as Jesse C. Martin (who had a high school education) was advanced into Coal Handling. He was subsequently promoted to utility operator on March 18, 1968. H. E. Martin, a Negro with a high school education, was promoted to Watchman on March 19, 1968, and subsequently to the position of Learner in Coal Handling. Another Negro, R. A. Jumper, was promoted to Watchman and then to Trainee for Test Assistant on May 7, 1968. These three were the only Negroes employed at Dan River who had high school educations. Recently, another Negro, Willie Boyd, completed a course which is recognized and accepted as equivalent to a high school education; thereby he became eligible for advancement under current company policies. Insufficient time has elapsed in which to determine whether or not Boyd will be advanced without discrimination, but it does appear that the company is not now discriminating in its promotion and transfer policies against Negro employees who have a high school education or its equivalent.
 
 
 12
 The plaintiff Negro employees admit that at the present time Duke has apparently abandoned its policy of restricting all Negroes to the Labor Department; but the plaintiffs complain that the educational and testing requirements preserve and continue the effects of Duke's past racial discrimination, thereby violating the Civil Rights Act of 1964.[1]
 
 
 13
 The district court found that prior to July 2, 1965, the effective date of the Civil Rights Act of 1964, Negroes were relegated to the Labor Department and deprived of access to other departments by reason of racial discrimination practiced by the company. This finding is fully supported by the evidence.
 
 
 14
 However, the district court also held that Title VII of the Civil Rights Act of 1964 does not encompass the present and continuing effects of past discrimination. This holding is in conflict with other persuasive authority and is disapproved. While it is true that the Act was intended to have prospective application only, relief may be granted to remedy present and continuing effects of past discrimination. Local 53 of International Association of Heat and Frost Insulators and Asbestos Workers v. Vogler, 407 F.2d 1047, 1052 (5 Cir. 1969); United States v. Local 189, 282 F.Supp. 39, 44 (E.D.La.1968), aff'd, 416 F.2d 980 (5 Cir. 1969); Quarles v. Philip Morris, Inc., 279 F.Supp. 505, 516 (E.D.Va.1968). See, United States v. Hayes International Corporation, 415 F.id 1038 (5 Cir. 1969) (Sept. 16, 1969). In Quarles, it was directly held that present and continuing consequences of past discrimination are covered by the Act, the court stating, 'It is also apparent that Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the act.' Quarles v. Philip Morris, Inc., supra, 279 F.Supp. at 516. The Quarles decision was expressly approved and followed in United States v. Local 189, supra, as the disctirct court, with subsequent approval of the Fifth Circuit Court of Appeals, struck down a seniority system which had the effect of perpetuating discrimination. '* * * Where, as here, 'job seniority' operates to continue the effects of past discrimination, it must be replaced * * *.' United States v. Local 189, supra at 45. In Local 53 of International Association of Heat and Frost Insulators and Asbestos Workers v. Volger, 407 F.2d 1047, 1052 (5 Cir. 1969), the court said: 'Where necessary to ensure compliance with the Act, the District Court was fully empowered to eliminate the present effects of past discrimination.'
 
 
 15
 Those six Negro employee-plaintiffs without a high school education or its equivalent who were discriminatorily hired only into the Labor Department prior to Duke's institution of the educational requirement in 1955 were simply locked into the Labor Department by the adoption of this requirement. Yet, on the other hand, may white employees who likewise did not have a high school education or its equivalent had already been hired into the better departments and were free to remain there and be promoted or transferred into better, higher paying positions. Thus, it is clear that those six plaintiff Negro employees without a high school education or its equivalent who were hired prior to the adoption of the educational requirement are entitled to relief; the educational requirement shall not be invoked as an absolute bar to advancement, but must be waived as to these plaintiffs and they shall be entitled to nondiscriminatory consideration for advancement to other departments if and when job openings occur.
 
 
 16
 Likewise, as to these same six Negro plaintiffs, the testing requirements established in 1965 are also discriminatory. The testing requirements, as will be fully explained later in this opinion, were established as an approximate equivalent to a high school education for advancement purposes. Since the adoption of the high school education requirement was discriminatory as to these six Negro employees and the tests are used as an approximate equivalent for advancement purposes, it must follow that the testing requirements were likewise discriminatory as to them. These six plaintiffs had to pass these tests in order to escape from the Labor Department while their white counterparts, many of whom also did not have a high school education, had been hired into departments other than the Labor Department and therefore were not required to take the tests. Therefore, as to these six plaintiffs, the testing requirements must also be waived and shall not be invoked as a bar to their advancement.
 
 
 17
 Next, we consider the rights of the second group of plaintiffs, those four Negro employees without a high school education or its equivalent who were hired into the Labor Department after the institution of the educational requirement. We find that they are not entitled to relief for the reasons to be hereinafter assigned. In determining the rights of this second group of plaintiffs, it is necessary to analyze and determine the validity of Duke's educational and testing requirements under the Civil Rights Act of 1964. We have found no cases directly in point. The Negro employee-plaintiffs contend that the requirements continue the effects of past discrimination and, therefore, must be struck down as invalid under the Act. We find ourselves unable to agree with that contention.
 
 
 18
 Plaintiffs claim that Duke's educational and testing requirements are discriminatory and invalid because: (1) there is no evidence showing a business need for the requirements; (2) Duke Power did not conduct any studies to discern whether or not such requirements were related to an employee's ability to perform his duties; and (3) the tests were not job-related, and 703(h) of the Civil Rights Act of 1964, 42 U.S.C. 2000e-2(h), requires tests to be job-related in order to be valid.
 
 
 19
 The company admits that it initiated the requirements without making formal studies as to the relationship or bearing such requirements would have upon its employees' ability to perform their duties. But, Duke claims that the policy was instituted because its business was becoming more complex, it had employees who were unable to grasp situations, to read, to reason, and who did not have an intelligence level high enough to enable them to progress upward through the company's line of advancement.
 
 
 20
 Pointing out that it uses an intracompany promotion system to train its own employees for supervisory positions inside the company rather than hire supervisory personnel from outside, Duke claims that it initiated the high school education requirement, at least partially, so that it would have some reasonable assurance that its employees could advance into supervisory positions; further, that its educational and testing requirements are valid because they have a legitimate business purpose, and because the tests are professionally developed ability tests, as sanctioned under 703(h) of the Act, 42 U.S.C. 2000e-2(h).
 
 
 21
 In examining the validity of the educational and testing requirements, we must determine whether Duke had a valid business purpose in adopting such requirements or whether the company merely used the requirements to discriminate. The plaintiffs claim that centuries of cultural and educational discrimination have placed Negroes at a disadvantage in competing with whites for positions which involve an educational or testing standard and that Duke merely seized upon such requirements as a means of discrimination without a business purpose in mind. Plaintiffs have admitted in their brief that an employer is permitted to establish educational or testing requirements which fulfill genuine business needs and that such requirements are valid under the Act. In support of this statement, we quote verbatim from appellants' brief:
 
 
 22
 'An employer is, of course, permitted to set educational or test requirements that fulfill genuine business needs. For example, an employer may require a fair typing test of applicants for secretarial positions. It may well be that, because of long-standing inequality in educational and cultural opportunities available to Negroes, proportionately fewer Negro applicants than white can pass such a test. But where bsiness need can be shown, as it can where typing ability is necessary for performance as a secretary, the fact that the test tends to exclude more Negroes than whites does not make it discriminatory. We do not wish even to suggest that employers are required by law to compensate for centuries of discrimination by hiring Negro applicants who are incapable of doing the job. But when a test or educational requirement is not shown to be based on business need, as in the instant case, it measures not ability to do a job but rather the extent to which persons have acquired educational and cultural background which has been denied to Negroes.'
 
 
 23
 Thus, plaintiffs would apparently concede that if Duke adopted its educational and testing requirements with a genuine business purpose and without intent to discriminate against future Negro employees, such requirements would not be invalidated merely because of Negroes' cultural and educational disadvantages due to past discrimination. Although earlier in this opinion we upheld the district court's finding that the company had engaged in discriminatory hiring practices prior to the Act and we concluded also that the educational and testing requirements adopted by the company continued the effects of this prior discrimination as to employees who had been hired prior to the adoption of the educational requirement, it seems reasonably clear that this requirement did have a genuine business purpose and that the company initiated the policy with no intention to discriminate against Negro employees who might be hired after the adoption of the educational requirement. This conclusion would appear to be not merely supported, but actually compelled by the following facts:
 
 
 24
 (1) Duke had long ago established the practice of training its own employees for supervisory positions rather than bring in supervisory personnel from outside.[2]
 
 
 25
 (2) Duke instituted its educational requirement in 1955, nine years prior to the passage of the Civil Rights Act of 1964 and well before the civil rights movement had gathered enough monentum to indicate the inevitability of the passage of such an act.[3]
 
 
 26
 (3) Duke has, by plaintiffs' own admission, discontinued the use of discriminatory tactics in employment, promotions and transfers.[4]
 
 
 27
 (4) The company's expert witness, Dr. Moffie, testified that he had observed the Dan River operation; had observed personnel in the performance of jobs; had studied the written summary of job duties; had spent several days with company representatives discussing job content; and he concluded that a high school education would provide the training, ability and judgment to perform tasks in the higher skilled classifications. This testimony is uncontroverted in the record.
 
 
 28
 (5) When the educational requirement was adopted it adversely affected the advancement and transfer of white employees who were Watchmen or were in the Coal Handling Department as well as Negro employees in the Labor Department.[5]
 
 
 29
 (6) Duke has a policy of paying the major portion of the expenses incurred by an employee who secures a high school education or its equivalent. In fact, one of the plaintiffs recently obtained such equivalent, the company paying seventy-five percent of the cost.[6]
 
 
 30
 Next, we consider the testing requirements to determine their validity and we conclude that they, too, are valid under 703(h) of the Civil Rights Act of 1964, 42 U.S.C. 2000e-2(h). In pertinent part, 703(h) reads: '* * * nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex, or national origin.'
 
 
 31
 There is no evidence in the record that there is any discrimination in the administration and scoring of the tests. Nor is there any evidence that the tests are not professionally developed. The company's expert, Dr. D. J. Moffie, testified that in his opinion the tests were professionally developed and are reliable and valid; that they are 'low level' tests and are given at Dan River by one who has had special training in the administration of such tests. The minimum acceptable scores used by the company are approximately those achieved by the average high school graduate, which fact indicates that the tests are accepted as a substitute for a high school education. The evidence disclosed that the minimum acceptable scores used by Duke are Wonderlic-20, and Bennett Mechanical-39; the score of the average high school graduate, i.e., the fiftieth percentile, is 21.9 for the Wonderlic, nearly two points higher than the score accepted by Duke, and 39 for the Bennett Mechanical.
 
 
 32
 The plaintiffs claim that tests must be job-related in order to be valid under 703(h). The Equal Employment Opportunity Commission which is charged with administering and implementing the Act supports plaintiffs' view. The EEOC has ruled that tests are unlawful '* * * in the absence of evidence that the tests are properly related to specific jobs and have been properly validated * * *.' Decision of EEOC, December 2, 1966, reprinted in CCH, Employment Practices Guide, P17,304.53. The EEOC's position has been supported by two federal district courts. United States v. H. K. Porter, 59 L.C. P9204 (M.D.Ala.1969); Dobbins v. Local 212, IBEW, 292 F.Supp. 413 (S.D.Ohio 1968). In Dobbins the court invalidated a test which was being given for membership in a labor union or in connection with a referral system because it was not adequately related to job performance needs. However, in that case it was clear that the testing requirement was not one of business necessity and the reasons for adopting such a requirement compellingly indicated that the purpose of such requirement was discrimination, which is not true in the present case.
 
 
 33
 The court below held that the tests given by Duke were not job-related, but then refused to give weight to the EEOC ruling that tests must be jobrelated in order to be valid under 703(h). The plaintiffs assert that such refusal was error. It has been held that the interpretation given a statute by an agency which was established to administer the statute is entitled to great weight. Udall v. Tallman, 380 U.S. 1, 15, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). This principle has been applied to EEOC interpretations given the Civil Rights Act of 1964. Weeks v. Southern Bell Telephone & Telegraph Co.,408 F.2d 228, 235 (5 Cir. 1969); Cox v. United States Gypsum Co., 284 F.Supp. 74, 78 (N.D.Ind.1968); International Chemical Workers Union v. Planters Manufacturing Co., 259 F.Supp. 365, 366 (N.D.Miss.1966). Plaintiffs cite these cases last mentioned above to support their argument that this court should adopt the EEOC ruling that tests must be job-related in order to be valid. However, none of these cases stands for the proposition that an EEOC interpretation is binding upon the courts; in fact, in International Chemical Workers, supra at 366, it was held that such interpretations of the EEOC are '* * * not conclusive on the courts * * *.' We cannot agree with plaintiffs' contention that such an interpretation by EEOC should be upheld where, as here, it is clearly contrary to compelling legislative history and, as will be shown, the legislative history of 703(h) will not support the view that a 'professionally developed ability test' must be job-related.
 
 
 34
 The amendment which incorporated the testing provision of 703(h) was proposed in a modified form by Senator Tower, who was concerned about a thenrecent finding by a hearing examiner for the Illinois Fair Employment Practices Commission in a case involving Motorola, Inc. The examiner had found that a pre-employment general intelligence test which Motorola had given to a Negro applicant for a job had denied the applicant an equal employment opportunity because Negroes were a culturally deprived or disadvantaged group. In proposing his original amendment, essentially the same as the version later unanimously accepted by the Senate, Senator Tower stated:
 
 
 35
 'It (the amendment which, in substance, became the ability testing provision of 703(h)) is an effort to protect the system whereby employers give general ability and intelligence tests to determine the trainability of prospective employees. The amendment arises from my concern about what happened in the Motorola FEPC case * * *.
 
 
 36
 'Let me say, only, in view of the finding in the Motorola case, that the Equal Employment Opportunity Commission, which would be set up by the act, operating in pursuance of Title VII, might attempt to regulate the use of tests by employers * * *.
 
 
 37
 'If we should fail to adopt language of this kind, there could be an Equal Employment Opportunity Commission ruling which would in effect invalidate tests of various kinds of employees by both private business and Government to determine the professional competence or ability or trainability or suitability of a person to do a job.' 110 Congressional Record 13492, June 11, 1964.
 
 
 38
 The discussion which ensued among members of the Senate reveals that proponents and opponents of the Act agreed that general intelligence and ability tests, if fairly administered and acted upon, were not invalidated by the Civil Rights Act of 1964. See, 110 Congressional Record 13503-13505, June 11, 1964.
 
 
 39
 The 'Clark-Case' interpretative memorandum pertaining to Title VII fortifies the conclusion that Congress did not intend to invalidate an employer's use of bona fide general intelligence and ability tests. It was stated in said memorandum:
 
 
 40
 'There is no requirement in Title VII that employers abandon bona fide VII that employers abandon bona fide qualification tests where, because of differences in background and education, members of some groups are able to perform better on these tests than members of other groups. An employer may set his qualifications as high as he likes, he may test to determine which applicants have these qualifications, and he may hire, assign, and promote on the basis of test performance.' 110 Congressional Record 7213, April 8, 1964.
 
 
 41
 When Senator Tower called up his modified amendment, which became the ability testing provision of 703(h), Senator Humphrey-- one of the leading proponents and the principal floor leader of the fight for passage of the entire Act-- stated:
 
 
 42
 'I think it should be noted that the Senators on both sides of the aisle who were deeply interested in Title VII have examined the text of this amendment and found it to be in accord with the intent and purpose of that title.
 
 
 43
 'I do not think there is any need for a rollcall. We can expedite it. The Senator has won his point.
 
 
 44
 'I concur in the amendment and ask for its adoption.' 110 Congressional Record 13724, June 13, 1964.
 
 
 45
 At no place in the Act or in its legislative history does there appear a requirement that employers may utilize only those tests which measure the ability and skill required by a specific job or group of jobs. In fact, the legislative history would seem to indicate clearly that Congress was actually trying to guard against such a result. An amendment requiring a 'direct relation' between the test and a 'particular position' was proposed in May 1968,[7] but was defeated. We agree with the district court that a test does not have to be job-related in order to be valid under 703(h).[8]
 
 
 46
 Having determined that Duke's educational and testing requirements were valid under Title VII, we reach the conclusion that those four Negro employees without a high school education who were hired after the adoption of the educational requirement are not entitled to relief. These employees were hired subject to the educational requirement; each accepted a position in the Labor Department with his eyes wide open. Under this valid educational requirement these four plaintiffs could have been hired only in the Labor Department and could not have been promoted or advanced into any other department irrespective of race, since they could not meet the requirement. Consequently, it could not be said that they have been discriminated against. Furthermore, since the testing requirement is being applied to white and Negro employees alike as an approximate equivalent to a high school education for advancement purposes, neither is it racially discriminatory.
 
 
 47
 Once we have determined that certain of the plaintiffs are entitled to relief the next question for consideration is the nature and extent of relief to be provided.[9] Those six Negro employees without a high school education or its equivalent who were hired prior to the initiation of the educational requirement are entitled to injunctive relief under 706(g) of the Civil Rights Act of 1964, 42 U.S.C. 2000e-5(g).[10] The educational and test requirements are invalid as applied to their eligibility for transfer and promotion. Thus, on remand, the district court should award proper injunctive relief to insure that these six employees are considered for any future openings without being subject to the educational or testing requirements. This will work no hardship upon the company since the relief provided will simply require it to consider those Negro employees equally with similarly situated white employees, many of whom do not have a high school education or its equivalent. If a Negro employee is advanced to a job in one of the better departments and his inability to perform the duties of the job its demonstrated after a reasonable period the company will be justified in returning him to his previous position or placing him elsewhere. As Judge Butzner said in Quarles, 279 F.Supp. 505, 521 (E.D.Va.1968), supra:
 
 
 48
 'If any transferee fails to perform adequately within a reasonable time * * * he may be removed and returned to the department and job classification from which he came, or to another higher job classification for which the company may believe him fitted.'
 
 
 49
 In granting relief, the district court should order that seniority rights of the six Negro employees who are victims of discrimination be considered on a plant-wide, rather than a departmental, basis. To apply strict departmental seniority would result in the continuation of present effects of past discrimination whenever one of the six is considered in the future for advancement to a vacant job in competition with a white employee who has already gained departmental seniority in a better department as a result of past discriminatory hiring practices. In United States v. Local 189, 282 F.Supp. 39, 44 (E.D.La.1968), aff'd, 416 F.2d 980 (5 Cir. 1969), supra, the court held:
 
 
 50
 'Where a seniority system has the effect of perpetrating discrimination, and concentrating or 'telescoping' the effect of past years of discrimination against Negro employees into the present placement of Negroes in an inferior position for promotion and other purposes, that present result is prohibited, and a seniority system which operates to produce that present result must be replaced with another system.'[11]
 
 
 51
 It is to be understood and remembered that there are thirteen named Negro plaintiffs who bring this action. Jesse C. Martin, a Negro formerly employed in the Labor Department who had a high school education, was advanced to a higher position subsequent to the effective date of the Act. He is not joined as a plaintiff since the past discrimination against him has been removed. This case is now moot as to two of the named Negro plaintiffs who have high school educations and have been advanced; also as to Willie Boyd, who has acquired the equivalent of a high school education and is now eligible for advancement.
 
 
 52
 Briefly summarizing, only those six Negro employees without a high school education or its equivalent who were hired prior to the adoption of the educational requirement are entitled to relief. As to them the judgment below is reversed and the case is remanded to the district court with directions to fashion appropriate injunctive relief consistent with this opinion. As to the remaining Negro plaintiff's the judgment below is affirmed.
 
 
 53
 Affirmed in part, reversed in part, and remanded.
 
 
 54
 SOBELOFF, Circuit Judge (concurring in part and dissenting in part):
 
 
 55
 The decision we make today is likely to be as pervasive in its effect as any we have been called upon to make in recent years. For the reason and because the prevailing opinion puts this circuit in direct conflict with the Fifth,[1] I find it appropriate to set forth my views in some detail.
 
 
 56
 While I concur in the grant of relief to six of the plaintiffs, I dissent from the majority opinion insofar as it upholds the Company's educational and testing requirements and denies relief to four Negro employees on that basis.
 
 
 57
 The case presents the broad question of the use of allegedly objective employment criteria resulting in the denial to Negroes of jobs for which they are potentially qualified.[2] This is not the first time the federal courts of our circuit have been exposed to this problem. In what has become a leading case, Judge Butzner of our court, sitting as a district judge by designation, authoritatively dealt with the question of the denial of jobs to blacks because of a seniority system built upon a pattern of past discrimination. Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va.1968). Today we are faced with an analogous issue, namely, the denial of jobs to Negroes who cannot meet educational requirements or pass standardized tests, but who quite possibly have the ability to perform the jobs in question. On this issue hangs the vitality of the employment provisions (Title VII) of the 1964 Civil Rights Act: whether the Act shall remain a potent tool for equalization of employment opportunity or shall be reduced to mellifluous but hollow rhetoric.
 
 
 58
 The pattern of racial discrimination in employment parallels that which we have witnessed in other areas. Overt bias, when prohibited, has ofttimes been supplanted by more cunning devices designed to impart the appearance of neutrality, but to operate with the same invidious effect as before. Illustrative is the use of the Grandfather Clause in voter registration-- a scheme that was condemned by the Supreme Court without dissent over a half century ago. Guinn v. United States, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915).[3] Another illustration is the resort to pupil transfer plans to nullify rezoning which would otherwise serve to desegregate school districts. Again, the illusory even-handedness did not shield the artifice from attack; the Supreme Court unanimously repudiated the plan. Goss v. Bd. of Education, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963). It is long recognized constitutional doctrine that 'sophisticated as well as simple-minded modes of discrimination' are prohibited. Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281 (1938) (Frankfurter, J.). We should approach enforcement of the Civil Rights Act in the same spirit.[4]
 
 
 59
 In 1964 Congress sought to equalize employment opportunity in the private sector. Title VII, 703(a) of the 1964 Civil Rights Act provides:
 
 
 60
 It shall be an unlawful employment practice for an employer--
 
 
 61
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 
 
 62
 (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. 2000e-2(a).
 
 
 63
 The statute is unambiguous. Overt racial discrimination in hiring and promotion is banned. So too, the statute interdicts practices that are fair in form but discriminatory in substance. Thus it has become well settled that 'objective' or 'neutral' standards that favor whites but do not serve business needs are indubitably unlawful employment practices. The critical inquiry is business necessity and if it cannot be shown that an employment practice which excludes blacks stems from legitimate needs the practice must end. Quarles v. Philip Morris, supra; Local 189 v. United States, 416 F.2d 980 (5th Cir., July 28, 1969); Local 53 of International Association of Heat and Frost Insulators and Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir., 1969). For example, a requirement that all applicants for employment shall have attended a particular type of school would seem racially neutral. But what if it develops that the specified schools were open only to whites, and if, moreover, they taught nothing of particular significance to the employer's needs? No one can doubt that the requirement would be invalid. It is the position of the Equal Employment Opportunities Commission (EEOC) that educational or test requirements which are irrelevant to job qualifications and which put blacks at a disadvantage are similarly forbidden.
 
 
 64
 * Use of Non-Job-Related Educational and Testing Standards
 
 
 65
 The Dan River plant of the Duke Power Company is organized into five departments: (1) Operations; (2) Maintenance; (3) Laboratory and Test; (4) Coal Handling; and (5) Labor. There is also a miscellaneous category which includes watchmen. Until 1965 blacks were routinely relegated to the all-Negro Labor Department as part of a policy of overt discrimination.
 
 
 66
 The era of outrightly acknowledged bias at Duke Power is admittedly at an end. However, plaintiffs contend that administration of certain 'objective' transfer criteria have accomplished substantially the same result. It was not until August 1966 that any Negro was promoted out of the Labor Department. Altogether, as of this date, three blacks have advanced from that department. They were the only ones that could measure up to the Company's requisites for transfer.[5]
 
 
 67
 In 1955 the Company first imposed its educational requirement: a high school diploma (or successful completion of equivalency ('GED') tests) would be necessary to progress from any of the outside departments (Labor, Coal Handling, Watchmen) to any of the inside departments (Operations, Maintenance, Laboratory and Test) or from Labor to the two other outside classifications. In 1965 the Company provided that in lieu of a high school diploma or equivalent, employees could satisfy the transfer standards by passing two 'general intelligence' tests, the 12 minute 'Wonderlic' test and the 30 minute 'Bennett Mechanical AA' test. It is uncontroverted that all of these requirements are equivalent.
 
 A. The Necessity for Job-Relatedness
 
 68
 Whites fare overwhelmingly better than blacks on all the criteria,[6] as evidenced by the relatively small promotion rate from the Labor Department since 1965. Therefore, the EEOC contends that use of the standards as conditions for transfer, unless they have significant relation to performance on the job, is improper. The requirements, to withstand attack, must be shown to appraise accurately those characteristics (and only those) necessary for the job or jobs an employee will be expected to perform. In other words, the standards must be 'job-related.'
 
 
 69
 Plaintiffs and the Commission are not asking, as the majority implies, that blacks be accorded favored treatment in order to remedy centuries of past discrimination. That may members of the long disfavored group find themselves ill equipped for certain employments is a burden which the 1964 Civil Rights Act does not seek to lift. The argument is only that educational and cultural differences caused by that history of deprivation may not be fastened on as a test for employment when they are irrelevant to the issue of whether the job can be adequately performed.
 
 
 70
 Duke Power, on the other hand, maintains that its selection standards are unimpeachable since in its view the tests (and therefore also the equivalent educational standard) are protected by 703(h) of Title VII.
 
 
 71
 Section 703(h) provides, in pertinent part:
 
 
 72
 * * * nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin.
 
 
 73
 42 U.S.C. 2000e-2(h).
 
 
 74
 The Company asserts that its tests are 'professionally developed ability tests' and thus do not have to be job-related. The District Court agreed and rejected the construction put upon 703(h) by the EEOC. The majority here adopts this view.
 
 
 75
 In its Guidelines on Employment Testing Procedures[7] the Commission has held that a test can be a 'professionally developed ability test' only if it
 
 
 76
 fairly measures the knowledge or skils required by the particular job or class of jobs which the applicant seeks, or which fairly affords the employer a chance to measure the applicant's ability to perform a particular job or class of jobs. The fact that a test was prepared by an individual or organization claiming expertise in test preparation does not, without more, justify its use within the meaning of Title VII.[8]
 
 
 77
 In rejecting the Commission Guidelines the District Court erred and the majority repeats the error. Under settled doctrine the Commission's interpretation should be accepted. The Supreme Court has held that
 
 
 78
 when faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. 'To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' Unemployment Compensation Commission of Territory of Alaska v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136. See also, e.g., Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301; Universal Battery Co. v. United States, 281 U.S. 580, 583, 50 S.Ct. 422, 74 L.Ed. 1051. 'Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new." Power Reactor Development Co. v. Electricians, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924.
 
 
 79
 Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).
 
 
 80
 In the Tallman case, the Court found that a construction of an Executive Order made by the Secretary of the Interior was not unreasonable. Accordingly, it followed the Secretary's interpretation.
 
 
 81
 Guidelines of the EEOC are entitled to similar consideration. The Fifth Circuit agrees. In Weeks v. Southern Bell Tel. & Tel. Co., 408 F.2d 228 (5th Cir., 1969), that court, in deciding a Title VII sex discrimination case, accorded 'considerable weight' to the EEOC guideline which construed the relevant statutory provision. In a more recent case the same court noted the rejection of the EEOC's position by the lower court in the present case and specifically disapproved of the decision here under review.[9] Local 189 v. United States, 416 F.2d 980 (July 28, 1969, 5 Cir.). We should do the same.
 
 
 82
 Other courts have reached similar results. Granting relief from the effects of a departmental and seniority structure, Judge Butzner found in Quarles that 'the restrictions do not result from lack of merit or qualification.' 279 F.Supp. at 513. The Eighth Circuit has held that 'it is essential that journeymen's examinations be objective in nature, that they be designed to test the ability of the applicant to do that work usually required of a journeyman * * *' United States v. Local 36, Sheet Metal Workers, 416 F.2d 123 (8th Cir. 1969). Accord, Dobbins v. Local 212, IBEW, 292 F.Supp. 413 (S.D.Ohio 1968).
 
 
 83
 Not only is the Commission's interpretation of 703(h) not unreasonable, but it makes eminent common sense. The Company would have us hold that any test authored by a professional test designer is 'professionally developed' and automatically merits the court's blessing. But, what is professionally developed for one purpose is not necessarily so far another. A professionally developed typing test, or example, could not be considered professionally developed to test teachers. Similarly, a test that is adequately designed to determine academic ability, such as a college entrance examination, may be grossly wide of the mark when used in hiring a machine operator. Moreover, the Commission's is the only construction compatible with the purpose to end discrimination and to give effect to 703(a). Although certainly not so intended, my brethren's resolution of the issue contains a built-in invitation to evade the mandate of the statute. To continue his discriminatory practices an employer need only choose any test that favors whites and is irrelevant to actual job qualifications. In this very case, the Company's oft-reiterated but totally unsubstantiated claim of business need has been deemed sufficient to sustain its employment standards. The record furnishes no supporting evidence, only the defendant's ipse dixit.
 
 
 84
 It would be enough to rest our decision on the reasonableness of the EEOC's position. A deeper look, however, at the legislative history of 703(h) provides powerful additional support for its construction.
 
 
 85
 Congressional discussion of employment testing came in the swath of the famous decision of an Illinois Fair Employment Practices Commission hearing examiner, Myart v. Motorola.[10] That case went to the extreme of suggesting that standardized tests on which whites performed better than Negroes could never be used. The decision was generally taken to mean that such tests could never be justified even if the needs of the business required them.
 
 
 86
 Understandably, there was an outcry in Congress that Title VII might produce a Motorola decision. Senators Clark and Case moved to counter that speculation. In their interpretive memorandum they announced that
 
 
 87
 there is no requirement in Title VII that employers abandon bona fide qualification tests where, because of differences in background and education, members of some groups are able to perform better on these tests than members of other groups. An employer may set his qualifications as high as he likes, he may test to determine which applicants have these qualifications, and he may hire, assign, and promote on the basis of test performance.[11]
 
 
 88
 Read against the context of the Motorola controversy, the import of the Clark-Case statement plainly appears: employers were not to be prohibited from using tests that determine qualifications. 'Qualification' implies qualification for something. A reasonable interpretation of what the Senators meant, in light of the events, was that nothing in the Act prevents employers from requiring that applicants be fit for the job. Tests for that purpose may be as difficult as an employer may desire.
 
 
 89
 Senator Tower, however, was not satisfied that a Motorola decision was beyond the purview of Title VII as written. He introduced an amendment which had the object of preventing the feared result. His amendment provided that a test, administered to all applicants without regard to race, would be permissible 'if * * * in the case of any individual who is an employee of such employer, such test is designed to determine or predict whether such individual is suitable or trainable with respect to his employment (or promotion or transfer) in the particular business or enterprise involved * * *.'[12] It was emphatically represented by the author that the amendment was 'not an effort to weaken the bill'[13] and 'would not legalize discriminatory tests'[14] but was offered to stave off an apprehended Motorola ruling that might 'invalidate tests * * * to determine the professional competence or ability or trainability or suitability of a person to do a job.'[15] It is highly noteworthy that Senator Tower's exertions were not on behalf of tests unrelated to job qualifications, but his aim was to make sure that jobrelated tests would be permitted. He squarely disavowed any broader aim.
 
 
 90
 Senators Case and Humphrey opposed the amendment as redundant.[16] Reiterating the message of the Clark-Case memorandum, Senator Case declared that 'the Motorola case could not happen under the bill the Senate is now considering.'[17] Senator Case also feared that some of the language in the amendment would be susceptible to misinterpretation.[18] The amendment was defeated.[19]
 
 
 91
 Two days later Senator Tower offered 703(h) in its present form, stating that it had been agreed to in principle 'but the language was not drawn as carefully as it should have been.'[20] The new amendment was acceptable to the proponents of the bill and it passed.[21]
 
 
 92
 What does this history denote? It reveals that because of the Motorola case there was serious concern that tests that select for job qualifications-- job-related tests-- might be deemed invalid under Title VII. Senators Clark, Case and Humphrey thought the fear illusory, but Senator Tower expended great effort to insure against the possibility. At the same time he gave assurance that he did not mean to weaken the Act. His first proposed amendment contained language which contemplated that tests were to be job-related. According to his own formulation tests had to be of such character as to determine whether 'an individual is suitable with respect to his employment.' At no time was there a clash of opinion over this principle but the amendment was opposed by proponents of the bill for other reasons and was rejected. The final amendment, which was acceptable to all sides could hardly have required less of a job relation than the first.[22] Since job-relatedness was never in dispute there is no room for the inference that the bill in its enacted form embodied a compromise on this point. The conclusion is inescapable that the Commission's construction of 703(h) is well supported by the legislative history.[23]
 
 
 93
 Manifestly, then, so far as Duke Power relies on 703(h) for the proposition that its tests (or other requirements) need not be job-related, it must fail.
 
 
 94
 B. The District Court's Finding and the Evidence Supporting It.
 
 
 95
 There can be no serious question that Duke Power's criteria are not job-related. The District Court expressly found that they were not,[24] and that finding is the only one consistent with the evidence.
 
 
 96
 To insure that a criterion is suitably fitted to a job or jobs, an employer is called upon to demonstrate that the standard was adopted after sufficient study and evaluation. It is not enough that officials think or hope that a requirement will work. In the District Court, Dr. Richard Barrett was qualified as an expert witness for plaintiff on the 'use of tests and other selection procedures for selection in promotion and employment.' He testified as to what sound business practice would dictate: First, a careful job analysis should be made, detailing the tasks involved in a job and the precise skills that are necessary. Then, on the basis of this analysis, selection procedures may be chosen that are adapted to the relevant abilities. Then, the most important step is to validate the chosen procedures, that is, to test their results with actual performance.
 
 
 97
 The EEOC concurs. The Guidelines detail methods to be used to develop, study, and validate employment criteria.[25]
 
 
 98
 Compare with the above what Duke Power has done and what it has failed to do. Company officials say that the high school requirement was adopted because they thought it would be helpful. Indeed, a company executive candidly admitted that
 
 
 99
 there is nothing magic about it, and it doesn't work all the time, because you can have a man who graduated from High School, who is certainly incompetent to go on up, but we felt this was a reasonable requirement * * *.
 
 
 100
 Duke Power offered the testimony of Dr. Dannie Moffie, an expert 'psychologist in the field of industrial and personnel testing.' Dr. Moffie agreed that a professionally developed test 'should be reliabe and * * * should be valid.' The question of validity, he said, is whether 'the test measures what it has been set up to measure.' Dr. Moffie never asserted that the Bennett and Wonderlic tests had been validated for job-relatedness. In fact, he testified that a job-related validity study was begun at the Dan River plant in 1966 but has not yet been completed. What this expert did claim was that the tests had been validated for their express purpose of determining 'whether or not a person has the intelligence level and the mechanical ability level that is characteristic of the High School graduate. According to Dr. Moffie,
 
 
 101
 when (the tests) function as a substitute or in lieu of a High School education, then the assumption is that the test then,-- the High School education is the kind of training and ability and judgment that a person needs to have, in order to do the jobs that we are talking about here * * *.
 
 
 102
 It is precisely this assumption that is totally unsubstantiated. The tests stand, and fall, with the high school requirement. The testimony does establish that the tests are the equivalent or a suitable substitute for a high school education, but there is an utter failure to establish that they sufficiently measure the capacity of the employee to perform any of the jobs in the inside departments. This is a fatal omission and should mark the end of the story.
 
 
 103
 C. The Alleged Business Justification.
 
 
 104
 But on the majority's theory, there can be business justification in the absence of job-relatedness. The Company's promotion policy has always been to give on-the-job training-- the next senior man is promoted if, after the tries out on the job, he is found qualified. The Company claims that ten years before the start of this suit it found that, its business having become increasingly complex, 'did not have an intelligence partments 'did not have an intelligence level high enough to enable them to progress' in the ordinary line of promotion. It is asserted that in order to ameliorate this situation and to 'upgrade the quality of its work force' the Company adopted the high school requirement, and later the alternative tests, as conditions for entry into the desirable inside departments. On these claims the majority grounds its determination of business need.
 
 
 105
 In fairness to the majority and to the Company, the thrust of this factual presentation is to suggest an argument that does not necessarily disavow jobrelatedness. Rather, the rule would be that the jobs for which the tests must be fitted may be jobs that employees will eventually, rather than immediately, be expected to fill. However, the plaintiffs and the Commission have neither addressed nor rejected that proposition. Rather, it is their contention, supported by the testing and finding below, that Duke Power has not shown that its educational and testing requirements are related to any job.[26]
 
 
 106
 Distilled to its essence, the underpinning upon which my brethren posit their argument is their expressed belief in the good faith of Duke Power. For them, the crucial inquiry is not whether the Company can establish business need, but whether it has a bad motive or has designed its tests with the conscious purpose to discriminate against blacks. Thus the majority stresses that the standards were adopted in 1955 when overt discrimination was the general rule, and hence the new policy was obviously not meant to accomplish that end. But this is not answer.
 
 
 107
 A man who is turned down for a job does not care whether it was because the employer did not like his skin color or because, although the employer professed impartiality, procedures were used which had the effect of discriminating against the applicant's race. Likewise irrelevant to Title VII is the state of mind of an employer whose policy, in practice, effects discrimination. The law will not tolerate unnecessarily harsh treatment of Negroes even though an employer does not plan this result. The use of criteria that are not backed by valid and corroborated business needs cannot be allowed, regardless of subjective intent. There can be no legitimate business purpose apart from business need; and where no business need is shown, claims to business purpose evaporate.[27]
 
 
 108
 It may be accepted as true that Duke Power did not develop its transfer procedures in order to evade Title VII, since in 1955 this enactment could not be foreseen. However, by continuing to utilize them at the present time, it is now evading the Act. And by countenancing the practice, this court opens the door to wholesale evasion. We may be sure that there will be many who will seek to pass through that door.
 
 
 109
 The Company's claim to business justification is further attenuated by imbalance in the application of the standards. Even if we view the standards as oriented toward future jobs, the fact remains that of those that might apply for such positions in the inside departments, only the outsiders must meet the questioned criteria in order to qualify. Intra-departmental progression remains the same. Also there is apparently no restriction on transfer from any of the inside departments to the other two inside departments. An employee with no more than a fifth grade education who has not taken the tests may try out for new inside jobs and transfer to a vacancy in another department if he is already in an inside department. In spite of Duke Power's vaunted faith in the necessity of a high school education or its equivalent, such an employee may, without any test, advance as far as his actual talents permit and qualify for higher pay.
 
 
 110
 The fact that Duke Power has not consisently relied on its standards, especially when viewed in light of the fact that the exempted inside group was constituted when racial discrimination was in vogue, belies the claim to business justification.
 
 
 111
 In short, Duke Power has not demonstrated how the exigencies of its business warrant its transfer standards. The realities of the Duke Power experience reveal that what the majority seizes upon as business need is in fact no more than the Company's bald assertion. The majority opinion's measure of 'genuine business purpose' must be very low indeed, for, after all is said and done, Duke Power has offered no reason for allowing it to continue its racially discriminatory procedures.
 
 II
 Discriminatory Application of Standards
 
 112
 As described above, the Company's criteria unfairly apply only to outsiders seeking entrance to the inside departments. This policy disadvantages those who were not favored with the the lax criteria used for whites before 1955. As I will show, this when juxtaposed with the history and racial composition of the Dan River plant, is itself sufficient to constitute a violation of Title VII.
 
 
 113
 It is true, as the majority points out, that the uneven-handed administration of transfer procedures works against some whites as well as blacks. It is also true that unlike the Constitution, Title VII does not prohibit arbitrary classifications generally. Its focus is on racial and other specified types of discrimination. Thus, when an employer capriciously favors the inside employees, to the detriment of those employed in the outside departments, this is not automatically an unlawful employment practice if whites as well as blacks are in the disadvantaged class.
 
 
 114
 On the other hand, it cannot be ignored that while this practice does not constitute forthright racial discrimination, the policy disfavoring the outside employees has primary impact on blacks. This effect is possible only because a history of overt bias caused the departments to become so imbalanced in the first place. The result is that in 1969, four years after the passage of Title VII, Dan River looks substantially like it did before 1965. The Labor Department is all black; the rest is virtually lily-white.
 
 
 115
 There no longer is room for doubt that a neutral superstructure built upon racial patterns that were discriminatorily erected in the past comes within the Title VII ban. Judge Butzner put the point to rest when he rejected an employer contention that 'the present consequences of past discrimination are outside the coverage of the act.' In his words, 'it is also apparent that Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the act.' Quarles v. Philip Morris, Inc., 279 F.Supp. 505, 515-516 (E.D.Va.1968).
 
 
 116
 A remedy for this kind of wrong is not without precedent. The 'freezing' principle (more properly, the anti-freezing principle), developed by the Fifth Circuit in voting cases is analogous. In those cases a pattern and practice of discrimination excluded almost all eligible Negroes from the voting lists but enrolled the vast majority of whites. Faced with judicial attack, the authorities found that they could no longer avowedly employ discriminatory practices. They invented and put into effect instead new, unquestionably even-handed, but onerous voting requirements which had the effect of excluding new applicants of both races, but, as was to be expected, primarily affected Negroes, who in the main were the unlisted ones. As the Fifth Circuit explained the principle.
 
 
 117
 the term 'freezing' is used in two senses. It may be said that when illegal discrimination or other practices have worked inequality on a class of citizens and the court puts an end to such a practice but a new and more onerous standard is adopted before the disadvantaged class may enjoy their rights, already fully enjoyed by the rest of the citizens this amounts to 'freezing' the privileged status for those who acquired it during the period of discrimination and 'freezing out' the group discriminated against.
 
 
 118
 United States v. Duke, 332 F.2d 759, 768 (5th Cir. 1964). Accordingly, the new voting requirements were struck down. This remedial measure was approved by the Supreme Court in Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965).
 
 
 119
 Applying similar reasoning to the Title VII employment context, the Fifth Circuit invalidated the nepotism policy of an all-white union, which restricted new members to relatives of old ones. Although the policy of course discriminated against whites as well as others, it was prohibited since it enshrined the white membership and effectively forever denied membership status to Negroes or Mexican-Americans. Local 53 of International Association of Heat and Frost Insulators and Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969).[28]
 
 
 120
 Title VII bars 'freeze-outs' as well as pure discrimination, where the 'freeze' is achieved by requirements that are arbitrary and have no real business justification. Thus Duke Power's discrimination against all those who did not benefit from the pre-1955 rule for whites operates as an illegal 'freeze-out' of blacks from the inside departments.
 
 III
 Conclusion
 
 121
 Beside the violation found by the majority, Duke Power is guilty of an unlawful employment practice in two other ways. First, it has used non-job-related transfer standards which have the effect of excluding blacks. Second, it has implemented those same standards in a discriminatory fashion so as to freeze blacks out of the inside departments.
 
 
 122
 This case deals with no mere abstract legal question. It confronts us with one of the most vexing problems touching racial justice and tests the integrity and credibility of the legislative and judicial process. We should approach our task of enforcing Title VII with full realization of what is at stake.
 
 
 123
 For all of the above reasons, the judgment of the District Court should be reversed with directions to grant relief to all of the plaintiffs.
 
 
 
 [1]
 Pertinent sections of Title VII of the Civil Rights Act of 1964 are:
 Section 703(a), 42 U.S.C. 2000e-2(a):
 It shall be an unlawful employment practice for an employer--
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
 Section 703(h), 42 U.S.C. 2000e-2(h):
 Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or provileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin.
 Section 706(g), 42 U.S.C. 2000e-5(g):
 If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice).
 
 
 [2]
 The company had an obvious business motive and objective in establishing the high school requirement, that is, hiring only personnel who had a reasonable expectation of ascending promotional ladders into supervisory positions thereby eliminating road blocks which would interfere with movement to higher classifications and tend to decrease efficiency and morale throughout the entire work force
 
 
 [3]
 It is highly improbable that the company seized upon such a requirement merely for the purpose of continuing discrimination
 
 
 [4]
 This tends to demonstrate the company's good faith
 
 
 [5]
 It is unreasonable to charge the company with prospective discrimination by instituting an educational requirement which was to be applied prospectively to white, as well as Negro, employees
 
 
 [6]
 It would be illogical to conclude that Duke established the educational requirement for purposes of discrimination when it was willing to pay for the education of incumbent Negro employees who could thus become eligible for advancement
 
 
 [7]
 Senate Report No. 1111, May 8, 1968
 
 
 [8]
 This decision is not to be construed as holding that any educational or testing requirement adopted by any employer is valid under the Civil Rights Act of 1964. There must be a genuine business purpose in establishing such requirements and they cannot be designed or used to further the practice of racial discrimination. Future cases must be decided on the bases of their own fact situations in light of pertinent considerations such as the company's past hiring and advancement policies, the time of the adoption of the requirements, testimony of experts and other evidence as to the business purpose to be accomplished, and the company's stated reasons for instituting such policies
 
 
 [9]
 The plaintiffs disclaim any request for or entitlement to relief other than by way of injunction. Had there been an issue as to monetary awards for damages to those plaintiffs found to have been the victims of racial discrimination, there would have been presented the further issue as to the date of applicability of the Act. There were only 95 employees at the Dan River plant when the Act became effective on July 2, 1965, but Duke Power Company then employed some 6,000 persons throughout ite entire system. The Act was initially applicable to employers with 100 or more employees, and it did not become applicable to employers with 75 to 100 employees until July 2, 1966. However, since the relief requested and awarded is solely injunctive in nature no question as to the applicability date of the Act is presented for decision
 
 
 [10]
 Section 706(g) of the Civil Rights Act of 1964 limits injunctive relief to situations in which an employer or a union has 'intentionally engaged in or is intentionally engaging in' an unlawful employment practice. While we have found Duke's educational and testing requirements valid as to employees hired subsequently to the adoption of the educational requirement, we further conclude that Duke had intentionally engaged in discriminatory hiring practices in earlier years long prior to the enactment of the Civil Rights Act of 1964 and that, as to those six Negro employees hired prior to the adoption of the educational requirement, the effects of this discrimination were continued. Thus, these six plaintiffs may be granted appropriate injunctive relief under 706(g). See, Clark v. American Marine Corp., 304 F.Supp. 603 (E.D.La. Sept. 15, 1969); Local 189 v. United States, 416 F.2d 980 (5 Cir. July 28, 1969)
 
 
 [11]
 Here, despite the company's representations to the contrary, it is apparent that strict departmental seniority is not always followed since the company admits that an employee sometimes enters a new department at a position above the entry level; however, it is the more general practice for an employee to enter a new department at the lowest classification therein
 
 
 [1]
 Local 189 v. United States, 416 F.2d 980 (5th Cir., July 28, 1969), discussed at note 8, infra
 
 
 [2]
 See generally Cooper and Sobel, Seniority and Testing Under Fair Employment Laws, A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv.L.Rev. 1598 (June 1969) (hereinafter cited as Cooper and Sobel); Note, Legal Implications of the Use of Standardized Ability Tests in Employment and Education, 68 Col.Rev. 691 (April 1968)
 
 
 [3]
 The opinion was unanimous save for Mr. Justice McReynolds, who took no part in the consideration or decision of the case
 
 
 [4]
 It is not part of my contention that the defendant in the present case availed himself of 'objective' employment procedures deliberately to evade the strictures of Title VII. As will be developed, an employer's state of mind when he adopts the standards is irrelevant when the effect of his actions is not different from purposeful discrimination. At any rate, it is my view that the majority's construction of Title VII will invite many employers to seize on such measures as tools for their forbidden designs
 
 
 [5]
 At oral argument we were told that one other black has since qualified but has not yet been transferred
 
 
 [6]
 No one seriously questions the fact that, in general, whites register far better on the Company's alternative requirements than blacks. The reasons are not mysterious
 High School Education. In North Carolina, census statistics show, as of 1960, while 34% Of white males had completed high school, only 12% Of Negro males had done so. On a gross level, then, use of the high school diploma requirement would favor whites by a ratio of approximately 3 to 1.
 Standardized Tests. It is generally known that standardized aptitude tests are designed to predict future ability by testing a cumulation of acquired knowledge.
 In other words, an aptitude test is necessarily measuring a student's background, his environment. It is a test of his cumulative experiences in his home, his community and his school.
 Hobson v. Hansen, 269 F.Supp. 401 (D.D.C.1967), aff'd sub nom., Smuck v. Hobson, 408 F.2d 175 (D.C.Cir. 1969) (en banc).
 Since for generations blacks have been afforded inadequate educational opportunities and have been culturally segregated from white society, it is no more surprising that their performance on 'intelligence' tests is significantly different than whites' than it is that fewer blacks have high school diplomas. In one instance, for example, it was found that 58% Of whites could pass a battery of standardized tests, as compared with only 6% Of the blacks. Included among those tests were the Wonderlic and Bennett tests. Decision of EEOC, cited in CCH Empl.Prac.Guide P1209.25 (Dec. 2, 1966).
 For a comprehensive analysis of the impact of standardized tests on blacks, see Cooper and Sobel, 1638-1641.
 
 
 [7]
 Issued September 21, 1966. The Guidelines may be found in CCH Empl.Prac. Guide P16,904 at 7319
 
 
 [8]
 The newly appointed chairman of the EEOC, William H. Brown, III, has recently reaffirmed this thesis. In an address on November 26, 1969 he asked representatives of more than forty trade associations to 'review selection and testing procedures to make sure they reflect actual job requirements.' 72 LRR 413, 416 (12/8/69)
 
 
 [9]
 Judge Wisdom stated that
 (The Griggs court) went on to strike down an EEOC interpretation of that provision which would limit the exemption to tests that measure ability 'required by the particular job or class of jobs which the applicant seeks.' * * *
 When an employer adopts a system that necessarily carries forward the incidents of discrimination into the present, his practice constitutes ongoing discrimination, unless the incidents are limited to those that safety and efficiency require. That appears to be the premise for the Commission's interpretation of 703(h). To the extent that Griggs departs from that view, we find it unpersuasive.
 416 F.2d at 994.
 
 
 [10]
 Decided on February 26, 1964. Reproduced in 110 Cong.Rec. 5662-64 (1964)
 
 
 [11]
 110 Cong.Rec. 7213 (1964)
 
 
 [12]
 The amendment was introduced on July 11, 1964. In its entirety it reads:
 (h) Notwithstanding any other provision of this title, it shall not be an unlawful employment practice for an employer to give any professionally developed ability test to any individual seeking employment or being considered for promotion or transfer, or to act in reliance upon the results of any such test given to such individual, if--
 (1) in the case of any individual who is seeking employment with such employer, such test is designed to determine or predict whether such individual is suitable or trainable with respect to his employment in the particular business or enterprise involved, and such test is given to all individuals seeking similar employment with such employer without regard to the individual's race, color, religion, sex, or national orgin, or
 (2) in the case of an individual who is an employee of such employer, such test is designed to determine or predict whether such individual is suitable or trainable with respect to his promotion or transfer by such employer without regard to the employee's race, color, religion, sex, or national origin.
 
 
 [110]
 Cong.Rec. 13492 (1964)
 
 
 [13]
 Id
 
 
 [14]
 Id. at 13504
 
 
 [15]
 Id. at 13492
 
 
 [16]
 Id. at 13503-04
 
 
 [17]
 Id. at 13503
 
 
 [18]
 In fact, it appears that Senator Case was concerned that the amendment might be construed the way Duke Power would have us construe the enacted 703(h)
 If this amendment were enacted it could be an absolute bar and would give an absolute right to an employer to state as a fact that he had given a test to all applicants, whether it was a good test or not, so long as it was professionally designed.
 Id. at 13504.
 
 
 [19]
 Id. at 13505
 
 
 [20]
 Id. at 13724
 
 
 [21]
 Id
 
 
 [22]
 Indeed, the avowed tightening of language by Senator Tower in the interim, n. 20, supra, was presumably in response to the misgiving expressed by Senator Case that the original amendment could lend itself to the construction that Duke Power now seeks. See n. 16, supra
 
 
 [23]
 The majority argues that congressional action some years after the passage of the 1964 Act supports the Company's position. This is not legislative history. Even if the import of the action were unequivocal it would not speak for the will of the 88th Congress which passed the statute
 The cited legislative deliberation was occasioned by a bill introduced in May 1968 to modify Title VII. See S. 3465, 90th Cong., 2d Sess. 6(c) (1968). If adopted it would have amended 703(h) to embody a job-related standard in express terms. However, the bill was not enacted. One can draw differing and inconsistent conclusions from these events. It could be argued, as the majority does, that the bill's proponents recognized that 703(h) as it stands does not contemplate job-relation. It is equally possible that the bill ultimately did not pass because the amendment was thought to be unnecessary. The bill's adherents might also have thought that the new amendment would represent no change, but offered it to forestall employers, such as Duke Power, from construing 703(h) incorrectly. The inferences to be drawn from the introduction of the bill and its death are at best ambiguous and inconclusive.
 If one must look to subsequent events for elucidation, consideration might be given to the comment of a Senator who was intimately involved in the passage of 703(h). Senator Humphrey has stated that in his view 703(h) did not protect tests if they were 'irrelevant to the actual job requirements.' Letter to American Psychological Association, quoted in The Ind. Psychologist (Div. 14, Am. Psychological Ass'n Newsletter), August, 1965, at 6, cited in Cooper and Sobel, 1653, n. 67.
 
 
 [24]
 The District Judge said:
 The two tests used by the defendant were never intended to accurately measure the ability of an employee to perform the particular job available. * * * These qualities are general in nature and are not indicative of a person's ability to perform a particular task. Nevertheless, they are qualities which the defendant would logically want to find in his employees.
 
 
 [292]
 F.Supp. 243, 250 (1968)
 
 
 [25]
 The recommended methods were adopted after study by a panel of psychologists. The Commission has the power 'to make such technical studies as are appropriate to effectuate the purposes and policies of this subchapter and to make the results of such studies available to the public(.)' 42 U.S.C. 2000e-4(f)(5)
 Also see 33 Fed.Reg. 14392 (1968). By order of the Secretary of Labor, detailed minimum standards of evidence of test validity have been issued for federal contractors. That evidence is reviewed by the Office of Federal Contract Compliance to determine whether or not a contractor has violated Executive Order 11,246, 3 C.F.R. 339 (1964-65 comp.), banning racial discrimination.
 
 
 [26]
 The notion that future jobs can be basis for a test is not inconsistent with the language of the Guidelines which speaks of 'the applicant's ability to perform a particular job or class of jobs.' Of course it would be impermissible for an employer to gear his requirements to jobs the availability of which is only a remote possibility. The office of Federal Contract Compliance administers Executive Order 11,246, 3 C.F.R. 339 (1964-65 comp.) which bans discrimination by government contractors. That agency has recognized this problem and has provided (by order of the Secretary of Labor) that when a hiring test is based on possible promotion to other jobs, promotion must be probable 'within a reasonable period of time and in a great majority of cases.' 33 Fed.Reg. 14392, 2(b)(1) (1968)
 In this case, however, the issue is not the propriety of testing for remote positions. We might assume that once an employee joins the line of progression his advance will be inexorable. Nevertheless, the fact remains that Duke Power's requirements have never been validated for jobs at the end of the ladder, let alone those on the bottom rung.
 
 
 [27]
 As I have noted from the outset of this discussion, the ultimate question under Title VII is whether there are business needs for an employer's policy. Plaintiffs agree and the majority properly quotes their brief, adding emphasis:
 An employer is, of course, permitted to set educational or test requirements that fulfill genuine business needs. * * * Where business needs can be shown * * * the fact that the test tends to exclude more Negroes than whites does not make it discriminatory.
 The statement is correct and certainly does not 'concede,' as the majority urges, that the question is only whether Duke Power had a 'genuine business purpose and (was) without intent to discriminate against future Negro employees * * *.'
 
 
 [28]
 See also Houston Maritime Ass'n, 168 NLRB 83, 66 LRRM 1337 (1967). A union, after having consistently rejected Negroes for membership, adopted a new 'freeze' policy whereby all new applicants were turned down, white and black. The Labor Board found that the union violated the National Labor Relations Act
 By adopting a practice which in operative effect created a preferred class in employment, the result was that the Union's previous policy of discrimination against Negroes as to job opportunities solely on the basis of race was continued and maintained.
 
 
 [66]
 LRRM, at 1339