Easterbrook, Circuit Judge, dissenting.
 

 I do not join the majority's opinion, because the statute lacks a plain meaning.
 
 Robinson v. Shell Oil Corp.
 
 ,
 
 519 U.S. 337
 
 ,
 
 117 S.Ct. 843
 
 ,
 
 136 L.Ed.2d 808
 
 (1997), held that the word "employees" in one part of Title VII includes ex-employees.
 
 Robinson
 
 interpreted text in context. Here, too, the judiciary must look outside one subsection to tell whether "individual" in
 
 29 U.S.C. § 623
 
 (a)(2) includes applicants for employment.
 

 But neither do I join all of Judge Hamilton's dissent, which relies on legislative purpose. The purpose of a law is imputed by judges; it is not a thing to be mined out of a statute. Even when we know what direction the legislature wanted to move, we must know how far to go-and making that choice is a legislative task. See, e.g.,
 
 Rodriguez v. United States
 
 ,
 
 480 U.S. 522
 
 , 525-26,
 
 107 S.Ct. 1391
 
 ,
 
 94 L.Ed.2d 533
 
 (1987). Our job is to apply the enacted text, the only thing to which the House, the Senate, and the President all subscribed, not to plumb legislators' hopes and goals.
 

 Section 623(a) provides:
 

 It shall be unlawful for an employer-
 

 (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
 

 (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or
 

 (3) to reduce the wage rate of any employee in order to comply with this chapter.
 

 The word "individual" in paragraph (1) includes applicants for employment; everyone agrees on this much. "Individual" reappears in paragraph (2), and normally
 one word used in adjacent paragraphs means a single thing. See Antonin Scalia & Bryan A. Garner,
 
 Reading Law: The Interpretation of Legal Texts
 
 (2011) (Canon 25: Presumption of Consistent Usage). Maybe the trailing phrase in paragraph (2)-"otherwise adversely affect his status as an employee"-implies that the word "individual" in paragraph (2) means only employees. That's what the majority believes. But maybe, as Part I.C of Judge Hamilton's dissent suggests, this phrase establishes an independent set of rights for employees, without implying that applicants for employment are not "individuals."
 

 The statutory context does not point ineluctably to one understanding. The majority does not explain why the statute would use "individual" in dramatically different ways within the space of a few words. But the principal dissent does not explain how we can read "individual" in paragraph (2) to include "applicant" without causing paragraphs (1) and (2) to converge. If that happens, then paragraph (2) applies disparate-impact analysis to all employment actions. That leaves little or nothing for paragraph (1) to do, for paragraph (2), no less than paragraph (1), prohibits disparate treatment.
 

 Smith v. Jackson
 
 ,
 
 544 U.S. 228
 
 , 236 n.6,
 
 125 S.Ct. 1536
 
 ,
 
 161 L.Ed.2d 410
 
 (2005) (plurality opinion), tells us that paragraphs (1) and (2) have different scopes and that only paragraph (2) provides disparate-impact liability. That conclusion is enough by itself to expose problems in Part III of Judge Hamilton's dissent, which in the name of legislative purpose would extend disparate-impact analysis across the board. Yet this does not help us to know what "individual" in paragraph (2)
 
 does
 
 mean. Perhaps Justice O'Connor was right in
 
 Smith
 
 ,
 
 544 U.S. at 247-68
 
 ,
 
 125 S.Ct. 1536
 
 (concurring opinion), and we should not impute disparate-impact liability to paragraph (2). The question we are addressing today may have no answer; it may be an artifact of the way the plurality in
 
 Smith
 
 distinguished paragraph (1) from paragraph (2), and if Justice O'Connor is right there's no need to search for that nonexistent answer. But that mode of resolving this suit is not open to a court of appeals.
 

 Because neither text nor purpose offers a satisfactory solution, we should stop with precedent.
 
 Griggs v. Duke Power Co
 
 .,
 
 401 U.S. 424
 
 ,
 
 91 S.Ct. 849
 
 ,
 
 28 L.Ed.2d 158
 
 (1971), treats the word "individual" in 42 U.S.C. § 2000e-2(a)(2), as it stood before an amendment in 1972, as including applicants for employment. The pre-1972 version of that statute is identical to the existing text in § 623(a) ; Congress copied this part of the ADEA from that part of Title VII. It may be that the Court in
 
 Griggs
 
 was careless to treat outside applicants for employment as "individuals" in paragraph (2), but that is what the Justices did. Part II of Judge Hamilton's opinion shows how this came to happen and also shows that many of the Supreme Court's later decisions read
 
 Griggs
 
 to hold that paragraph (2) in the pre-1972 version of Title VII applies disparate-impact theory to outside applicants for employment. If the Justices think that this topic (or
 
 Smith
 
 itself) needs a new look, the matter is for them to decide. I therefore join Part II of Judge Hamilton's dissenting opinion.
 

 Hamilton, Circuit Judge, dissenting, joined by Wood, Chief Judge, and Rovner, Circuit Judge, and joined as to Part II by Easterbrook, Circuit Judge.
 

 We should reverse the district court's Rule 12(b)(6) dismissal of plaintiff Dale Kleber's disparate impact claim and remand for further proceedings. The key provision of the Age Discrimination in Employment Act prohibits both employment
 practices that discriminate intentionally against older workers and those that have disparate impacts on older workers.
 
 29 U.S.C. § 623
 
 (a) ;
 
 Smith v. City of Jackson
 
 ,
 
 544 U.S. 228
 
 ,
 
 125 S.Ct. 1536
 
 ,
 
 161 L.Ed.2d 410
 
 (2005). The central issue in this appeal is whether the disparate-impact provision, § 623(a)(2), protects only current employees or whether it protects current employees
 
 and
 
 outside job applicants.
 

 We should hold that the disparate-impact language in § 623(a)(2) protects both outside job applicants and current employees. Part I of this opinion explains why that's the better reading of the statutory text that is at worst ambiguous on coverage of job applicants. While other ADEA provisions protect job applicants more clearly, the Supreme Court guides us away from the majority's word-matching and toward a more sensible and less arbitrary reading. See
 
 Robinson v. Shell Oil Co
 
 .,
 
 519 U.S. 337
 
 , 341-46,
 
 117 S.Ct. 843
 
 ,
 
 136 L.Ed.2d 808
 
 (1997).
 

 Part II explains that protecting outside job applicants tracks the Supreme Court's reading of identical statutory language in Title VII of the Civil Rights Act of 1964. In
 
 Griggs v. Duke Power Co
 
 .,
 
 401 U.S. 424
 
 , 426 n.1, 431,
 
 91 S.Ct. 849
 
 ,
 
 28 L.Ed.2d 158
 
 (1971), the Court found that this same disparate-treatment language protects not only current employees but also "the job-seeker"-people like plaintiff Kleber. We should read the same language the same way. The majority tries to avoid this reasoning by narrowing
 
 Griggs
 
 and attributing significance to the 1972 amendment of the Title VII disparate-impact provision. As detailed in Part II, the actual facts of both the
 
 Griggs
 
 litigation and the 1972 amendment flatly contradict the majority's glib and unsupported theories.
 

 Part III explains that protecting both outside applicants and current employees is also more consistent with the purpose of the Act (as set forth in the statute itself) and avoids drawing an utterly arbitrary line. Neither the defendant nor its amici have offered a plausible policy reason why Congress might have chosen to allow disparate-impact claims by current employees, including internal job applicants, while excluding outside job applicants. The en banc majority does not even try to do so, following instead a deliberately naïve approach to an ambiguous statutory text, closing its eyes to fifty years of history, context, and application.
 

 I.
 
 The Text of the ADEA's Disparate-Impact Provision
 

 A.
 
 Statutory Text of Disputed Provision
 

 We begin with the statutory language, of course. We analyze the specific words and phrases Congress used, but we cannot lose sight of their "place in the overall statutory scheme," since we "construe statutes, not isolated provisions."
 
 King v. Burwell
 
 , --- U.S. ----,
 
 135 S.Ct. 2480
 
 , 2489,
 
 192 L.Ed.2d 483
 
 (2015), quoting
 
 FDA v. Brown & Williamson Tobacco Corp.
 
 ,
 
 529 U.S. 120
 
 , 133,
 
 120 S.Ct. 1291
 
 ,
 
 146 L.Ed.2d 121
 
 (2000), and
 
 Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson
 
 ,
 
 559 U.S. 280
 
 , 290,
 
 130 S.Ct. 1396
 
 ,
 
 176 L.Ed.2d 225
 
 (2010). As the Supreme Court explained in dealing with a similar issue in Title VII: "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."
 
 Robinson
 
 ,
 
 519 U.S. at 341, 346
 
 ,
 
 117 S.Ct. 843
 
 (protection of "employees" from retaliation included former employees).
 

 The key provision of the ADEA,
 
 29 U.S.C. § 623
 
 (a), reads:
 

 It shall be unlawful for an employer-
 (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
 

 (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or
 

 (3) to reduce the wage rate of any employee in order to comply with this chapter.
 

 The disparate-treatment provision, paragraph (a)(1), does not refer to job applicants, but it clearly applies to them by making it unlawful for the employer "to fail or refuse to hire ... any individual ... because of such individual's age." The disparate-impact provision, paragraph (a)(2), also does not refer specifically to applicants or hiring decisions, but its broad language easily reaches employment practices that hurt older job applicants as well as current older employees.
 

 Start with the critical statutory language, which includes two parallel provisions that prohibit employers from engaging in certain behavior. Under paragraph (a)(1), an employer may not intentionally discriminate against an older individual by firing or failing to hire or promote her because she is older-i.e., engage in disparate treatment of older individuals. Paragraph (a)(2) prohibits an employer from creating an internal employee classification or limitation that has the effect of depriving "any individual of employment opportunities" or adversely affecting his or her status as an employee because of age-i.e., creating an internal classification system with a disparate impact against older individuals.
 

 If an employer classifies a position as one that must be filled by someone with certain minimum or maximum experience requirements, it is classifying its employees within the meaning of paragraph (a)(2). If that classification "would deprive or tend to deprive any individual of employment opportunities" because of the person's age, paragraph (a)(2) can reach that classification. The broad phrase "any individual" reaches job applicants, so the focus turns to the employer's action and its effects-i.e., whether the employer has classified jobs in a way that tends to limit
 
 any
 
 individual's employment opportunities based on age. See
 
 Smith
 
 ,
 
 544 U.S. at 234, 235-38
 
 ,
 
 125 S.Ct. 1536
 
 (plurality) (explaining that this "text focuses on the
 
 effects
 
 of the action" and not the employer's motive);
 

 id.
 

 at 243
 
 ,
 
 125 S.Ct. 1536
 
 (Scalia, J., concurring).
 
 [1]
 
 The defendant's maximum-experience requirement in this case certainly limited plaintiff Kleber's employment opportunities.
 

 B.
 
 The Majority's Cramped Reading
 

 To avoid this conclusion, the majority emphasizes the phrase "or otherwise adversely affect his status as an employee," reading it to limit the statute's disparate-impact protection "to an individual with 'status as an employee.' " Ante at 482-83. Note that the key "with" in that phrase-repeated several times in the majority opinion-comes only from the majority, not from the statute itself. It's not correct. The antecedent of "his" is "any individual," and "otherwise adversely affect" is even broader than "deprive or tend to deprive
 any individual of employment opportunities."
 

 The crux of the majority's argument is that if "any individual" is not already employed by the employer in question, the individual does not yet have "status as an employee" and so is not protected from policies or practices that have disparate impacts because of age. The majority thus concludes that a "person's status as an employee" cannot be affected unless the person is
 
 already
 
 an employee. If that's true, then paragraph (a)(2) subtly limits its protections from disparate impacts to people who already possess "status as an employee" with the defendant-employer.
 

 The majority's analysis nullifies the two uses of the broad word "individual," which certainly reaches job applicants. What Congress meant to say, the majority argues, is that it's unlawful for an employer "to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any
 
 current employee
 
 [not "any individual"] of employment opportunities or otherwise adversely affect his status as an employee, because of such
 
 employee's
 
 [not "individual's"] age."
 

 How does one read a bar against depriving "any individual" of "employment opportunities" to exclude all cases where a person is looking for a job? And if Congress meant to limit the provision's coverage only to current employees, why didn't it just use the word "employee"? It had used that word twice in this provision already. Courts are generally loath to read statutory terms out of a textual provision and to insert limitations that are not evident in the text. See
 
 Mount Lemmon Fire District v. Guido
 
 , --- U.S. ----,
 
 139 S.Ct. 22
 
 , 26,
 
 202 L.Ed.2d 262
 
 (2018) (refusing to read limitation into ADEA's coverage that is not apparent from text, noting that "[t]his Court is not at liberty to insert the absent qualifier").
 

 C.
 
 The Better Reading
 

 If we look at the language of paragraph (a)(2) in isolation, the majority's mechanical reading has some superficial plausibility, but it should be rejected. At the textual level, there are three distinct and fundamental problems.
 

 First, as Judge Easterbrook points out, the majority's theory gives the phrase "any individual" very different meanings in adjoining paragraphs (a)(1) and (a)(2) of § 623. Ante at 488-89. See also, e.g.,
 
 Mohasco Corp. v. Silver
 
 ,
 
 447 U.S. 807
 
 , 826,
 
 100 S.Ct. 2486
 
 ,
 
 65 L.Ed.2d 532
 
 (1980) (declining to interpret § 706 of Title VII so that the word "filed" would have different meanings in different subsections).
 

 Second, the majority merely assumes that "affect his status as an employee" necessarily
 
 limits
 
 the already broad phrase, "deprive or tend to deprive any individual of employment opportunities." It is not self-evident-at least as a matter of
 
 plain
 
 meaning-that the latter "status" phrase must be read as limiting the former. A list culminating in an "or otherwise" term can instead direct the reader to consider the last phrase as a catch-all alternative, "in addition to" what came before, to capture prohibited actions that might otherwise escape the statute's reach. For example, an employer can violate the ADEA by adversely affecting the status of its employees (e.g., by giving bigger raises to junior employees, as alleged in
 
 Smith
 
 ,
 
 544 U.S. at 231
 
 ,
 
 125 S.Ct. 1536
 
 ) without depriving an individual of employment opportunities such as better jobs and promotions. In this sense, paragraph (a)(2) "enumerates various factual means of committing a single element"-imposing employment policies that have disparate impacts on older workers. See
 
 Mathis v. United States
 
 , 579 U.S. ----,
 
 136 S.Ct. 2243
 
 , 2249,
 
 195 L.Ed.2d 604
 
 (2016) (discussing
 various ways to write an "alternatively phrased law").
 

 In
 
 Helsinn Healthcare S.A. v. Teva Pharmaceuticals USA, Inc.
 
 , 586 U.S. ----,
 
 139 S.Ct. 628
 
 , 634, --- L.Ed.2d ---- (2019), the Supreme Court rejected a remarkably similar argument that attempted to use an "otherwise" phrase to limit what came before. Much like the majority here, the patentee argued that "otherwise available to the public" in the Patent Act's "on sale" bar meant that the preceding language also required
 
 public
 
 availability after a sale. The patentee "places too much weight on [the] catchall phrase. Like other such phrases, 'otherwise available to the public' captures material that does not fit neatly into the statute's enumerated categories but is nevertheless meant to be covered." See also
 
 Republic of Iraq v. Beaty
 
 ,
 
 556 U.S. 848
 
 , 860,
 
 129 S.Ct. 2183
 
 ,
 
 173 L.Ed.2d 1193
 
 (2009) (explaining that "the whole value of a generally phrased residual clause, like the one used in the second proviso, is that it serves as a catchall for matters not specifically contemplated-known unknowns"). If "otherwise adversely affect his status as an employee" does not
 
 necessarily
 
 limit the entire disparate-impact phrase-if it is instead a catch-all phrase for known unknowns, as the Supreme Court explained in
 
 Texas Dep't of Housing & Community Affairs v. Inclusive Communities Project, Inc
 
 ., 576 U.S. ----,
 
 135 S.Ct. 2507
 
 , 2519,
 
 192 L.Ed.2d 514
 
 (2015) (linking "otherwise" phrases in ADEA, Title VII, and Fair Housing Act as establishing textual foundations for disparate-impact protection)-the majority's textual analysis collapses.
 

 Third, even if "status as an employee" must be affected to state a disparate-impact claim under (a)(2), the majority's conclusion also depends entirely on the unlikely notion that "status as an employee" is not "adversely affected" when an employer denies an individual the opportunity to become an employee in the first place. Refusing to hire an individual has the most dramatic possible adverse effect on that individual's "status as an employee." Reading "status as an employee" broadly, to include whether the individual is an employee or not, is consistent with the actual words Congress used in repeatedly referring to "individuals," and with ordinary usage. Courts often speak of "denying status" of one sort or another.
 
 [2]
 
 And the word
 "status" is not necessarily limited to status as of any particular moment.
 
 1 U.S.C. § 1
 
 (Dictionary Act providing that "unless the context indicates otherwise ... words used in the present tense include the future as well as the present").
 

 In short, the effect of the phrase "otherwise adversely affects his status as an employee" on job applicants is at worst ambiguous for applicants like Kleber. The majority loads onto that phrase more weight than it can bear. If Congress really meant to exclude job applicants from disparate-impact protection, the phrase "status as an employee" was a remarkably obscure and even obtuse way to express that meaning.
 

 D.
 
 Comparing § 623(a)(2) to Other ADEA Provisions
 

 Congress no doubt could have written § 623(a)(2) to make clearer its protection of outside job applicants, as it did in other ADEA provisions and other statutes. As explained by Justice Thomas for a unanimous Supreme Court in
 
 Robinson v. Shell Oil
 
 , however, that observation does not prove that Congress chose
 
 not
 
 to provide that protection. 519 U.S. at 341-42,
 
 117 S.Ct. 843
 
 (language in other statutes "proves only that Congress
 
 can
 
 use the unqualified term 'employees' to refer only to current employees, not that it did so in this particular statute").
 

 The first statutory text that provides guidance on how to read § 623(a)(2) is the statute's stated purpose, which the majority largely disregards. Congress told us it set out to address "the incidence of unemployment, especially long-term unemployment" among older workers.
 
 29 U.S.C. § 621
 
 (a)(3). In the statute, Congress said it was "especially" concerned about the difficulty older workers faced in trying to "regain employment when displaced from jobs"-in other words, when older workers were
 
 applying for jobs
 
 . See § 621(a)(1). Unemployment ends when a person who is not currently employed applies successfully for a job. As the ADEA itself provides, "it is ... the purpose of this chapter to promote employment of older persons based on their ability rather than age." § 621(b).
 

 The majority, however, focuses on comparing § 623(a)(2) to several neighboring provisions in the ADEA that distinguish clearly between current employees and job applicants. The majority, to support its improbable result, reads too much into the differences in wording.
 

 The unlawful employment practices section of the ADEA begins with three subsections prohibiting age discrimination in employment by three different kinds of actors-private and public employers, employment agencies, and labor organizations.
 
 29 U.S.C. § 623
 
 (a) - (c) ; see also § 630(b) (defining "employer"). Subsections (a), (b), and (c) are all worded slightly differently. In the following subsection (d), the ADEA prohibits retaliation by any of these private-sector actors. In another section, the ADEA provides for a different and even broader policy prohibiting age discrimination in federal hiring and employment. § 633a(a).
 

 The majority compares three of those ADEA provisions: the labor union provision in § 623(c)(2), the retaliation provision in § 623(d), and the federal government provision in § 633a(a). All three of these provisions use the phrase "applicant for employment." The majority invokes the common presumption that a difference in statutory wording signals a difference in Congressional intent and meaning. That
 presumption, however, is only a tool, not an inflexible rule. We need some basis beyond simple word-matching to believe that these particular differences in language were intended to distinguish the ADEA's disparate-impact provision from these other provisions to produce such an improbable result as excluding older job applicants from disparate-impact protection.
 

 Instructive here is the Supreme Court's approach to interpreting the term "employee" in Title VII's anti-retaliation provision.
 
 Robinson v. Shell Oil
 
 , 519 U.S. at 339-41,
 
 117 S.Ct. 843
 
 . Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment" who have either availed themselves of Title VII's protections or assisted others in doing so. 42 U.S.C. § 2000e-3(a). The issue in
 
 Robinson
 
 was whether this language prohibits retaliation against former employees. As in this case, the Court had to interpret a provision that was not as clear as other related provisions. The fact that "Congress also could have used the phrase 'current employees,' " or "expressly included the phrase 'former employees' does not aid our inquiry." 519 U.S. at 341,
 
 117 S.Ct. 843
 
 . That "the term 'employees' may have a plain meaning in the context of a particular section," or that "other statutes have been more specific in their coverage of 'employees' and 'former employees,' ... proves only that Congress
 
 can
 
 use the unqualified term 'employees' to refer only to current employees"-"not that the term has the same meaning in all other sections and in all other contexts."
 

 Id.
 

 at 341-43
 
 ,
 
 117 S.Ct. 843
 
 .
 

 Adopting an approach that fits here, the Court wrote: "Because the term 'applicants' in § 704(a) is not synonymous with the phrase 'future employees,' there is no basis for engaging in the further (and questionable) negative inference that inclusion of the term 'applicants' demonstrations intentional exclusion of former employees."
 

 Id.
 

 at 344-45
 
 ,
 
 117 S.Ct. 843
 
 . In fact, the Court reasoned, to hold that the term "employee" does not include former employees "would effectively vitiate much of the protection afforded by § 704(a)," and "undermine the effectiveness of Title VII by allowing the threat of postemployment retaliation to deter victims of discrimination from complaining to the EEOC, and would provide a perverse incentive for employers to fire employees who might bring Title VII claims."
 

 Id.
 

 at 345-46
 
 ,
 
 117 S.Ct. 843
 
 .
 

 In short, the Court concluded, an "inclusive interpretation of 'employees' in § 704(a) that is already suggested by the broader context of Title VII"-and that is not "destructive of [the] purpose" of the statute by allowing an employer to escape liability for "an entire class of acts"-"carry persuasive force given their coherence and their consistency with a primary purpose" of the statutory provision.
 

 Id.
 

 at 346
 
 ,
 
 117 S.Ct. 843
 
 . We should use the same approach here.
 

 Instead, the majority's reading of § 623(a)(2) creates a strange incongruity. All actors who regularly recruit job applicants-employment agencies, labor unions, and federal agencies-are prohibited from engaging in age discrimination, including disparate-impact discrimination. See
 
 29 U.S.C. §§ 623
 
 (b), 623(c)(2), & 633a(a). Yet the majority concludes that Congress chose to allow private
 
 employers
 
 to use practices with disparate impacts on older job applicants. This is a truly odd reading, especially in light of the statute's stated purpose and the rest of § 623, where Congress grouped employers, employment agencies, and labor organizations together with respect to retaliation, job advertisements, and the use of bona fide occupational
 qualifications and reasonable factors other than age. See Pub. L. 90-202, § 4(d)-(f),
 
 81 Stat. 603
 
 (1967).
 

 Half a century after the ADEA was enacted, we can see that Congress could have been more precise in phrasing the disputed provision. The majority errs, though, in concluding boldly that the text "leaves room for only one interpretation." Ante at 485. The majority naively puts on blinders, considers only the language of the ADEA in isolation, and, as we'll see, ignores precedent, legislative history, and practical consequences to offer one cramped reading for the scope of § 623(a). The text alone does not provide sufficient grounds for choosing between two readings of one of the statute's most important protections, one that protects outside job applicants, and one that excludes them.
 

 II.
 
 Griggs, Title VII, and the ADEA
 

 A.
 
 Griggs and "Job-Seekers"
 

 The most reliable basis for choosing between these two readings of the statutory text is to follow the Supreme Court's interpretation of identical language in Title VII of the Civil Rights Act of 1964 in
 
 Griggs v. Duke Power
 
 ,
 
 401 U.S. at 430-31
 
 ,
 
 91 S.Ct. 849
 
 . In
 
 Griggs
 
 , the Court held that the language of Title VII as enacted in 1964 included disparate-impact protection for both job-seekers and current employees seeking promotions. That authoritative construction of identical language should control here. See
 
 Smith
 
 ,
 
 544 U.S. at 233-38
 
 ,
 
 125 S.Ct. 1536
 
 (applying
 
 Griggs
 
 to § 623(a)(2) in ADEA);
 
 Texas Dep't of Housing and Community Affairs
 
 , 135 S.Ct. at 2518 (applying analysis of identical statutory language in
 
 Griggs
 
 (Title VII) and
 
 Smith
 
 (ADEA) to interpret parallel disparate-impact provision in Fair Housing Act); see also, e.g.,
 
 Metropolitan Life Ins. Co. v. Taylor
 
 ,
 
 481 U.S. 58
 
 , 65,
 
 107 S.Ct. 1542
 
 ,
 
 95 L.Ed.2d 55
 
 (1987) (field preemption applies to ERISA because Congress copied ERISA's jurisdictional language from Labor Management Relations Act, to which field preemption applied).
 

 1.
 
 Parallel Statutory Texts
 

 The ADEA's § 623(a)(2) tracks word-for-word the parallel provision for race, sex, religious, and national origin discrimination in Title VII of the Civil Rights Act of 1964, as it was enacted in 1964, as it stood when the ADEA was enacted, and as it stood when
 
 Griggs
 
 was decided. Here's the original language of Title VII's parallel disparate-treatment and disparate-impact provisions:
 

 (a) It shall be an unlawful employment practice for an employer-
 

 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 

 (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
 

 78 Stat. 255
 
 , quoted in
 
 Griggs
 
 ,
 
 401 U.S. at
 
 426 n.1,
 
 91 S.Ct. 849
 
 . The
 
 only
 
 difference between Title VII's § 703(a)(2) and the ADEA's § 623(a)(2) is the substitution of "age" for "race, color, religion, sex, or national origin." That's why
 
 Smith v. City of Jackson
 
 described
 
 Griggs
 
 as "a precedent of compelling importance" in interpreting the ADEA's disparate-impact language.
 
 544 U.S. at 234
 
 ,
 
 125 S.Ct. 1536
 
 .
 

 In
 
 Griggs
 
 , the Supreme Court unanimously held that Title VII "proscribes not only overt discrimination but also practices
 that are fair in form, but discriminatory in operation"-e.g., practices with disparate impacts against protected groups.
 
 Griggs
 
 ,
 
 401 U.S. at 431
 
 ,
 
 91 S.Ct. 849
 
 . "The touchstone is business necessity," the Court explained, as "the very purpose of title VII is to promote hiring on the basis of job qualifications, rather than on the basis of race or color."
 

 Id.
 

 at 431, 434
 
 ,
 
 91 S.Ct. 849
 
 , quoting 110 Cong. Rec. 7247 (1964).
 

 The majority contends
 
 Griggs
 
 offers no guidance here because "nothing about the case, brought as it was by employees of Duke Power and not outside applicants, required the Court to answer th[e] question" whether Title VII's disparate impact provision extended to job applicants. Ante at 485. The majority treats the Supreme Court's references in
 
 Griggs
 
 to hiring as careless slips of the pen. As a general rule, that is not how lower federal courts should read Supreme Court opinions. More specifically, a closer look at
 
 Griggs
 
 shows that the majority's approach is 180 degrees off course.
 

 2.
 
 The Facts of Griggs
 

 Beyond reasonable dispute, the
 
 Griggs
 
 holding included job applicants. The majority ignores the fact that
 
 Griggs
 
 was a class action. The district court had certified a class "defined as those Negroes presently employed, and who subsequently may be employed, at [Duke Power's plant] and all Negroes
 
 who may hereafter seek employment
 
 "-i.e., job applicants.
 
 Griggs v. Duke Power Co.
 
 ,
 
 292 F.Supp. 243
 
 , 244 (M.D.N.C. 1968) (emphasis added). After remand from the Supreme Court, the district court enjoined Duke Power from, among other practices, "administering any personnel or aptitude tests or requiring any formal educational background ... as a condition of
 
 consideration for employment
 
 or promotion or transfer."
 
 Griggs v. Duke Power Co
 
 .,
 
 1972 WL 215
 
 at *1 (Sept. 25, 1972) (emphasis added). Of course the Supreme Court's holding applied to job applicants.
 

 And that was for good reason. The
 
 Griggs
 
 class challenged employment practices that had the effect of segregating the workforce. Duke Power classified its employees into two main groups: (1) the "inside departments," historically staffed by white employees, with higher pay and responsible for tasks such as operating the boilers and maintaining the plant equipment; and (2) the Labor Department, the lowest-wage unit, "responsible generally for the janitorial services" and historically staffed by black employees.
 
 Griggs v. Duke Power Co
 
 .,
 
 420 F.2d 1225
 
 , 1245-46 (4th Cir. 1970) (Sobeloff, J., dissenting);
 
 id
 
 . at 1228-29 (majority). Before the civil rights movement, white and black employees (within their respective segregated departments) had been hired and promoted with middle school levels of education or less, and certainly without high school diplomas; there was no indication that any particular level of formal education was needed to work at the power plant.
 

 Id.
 

 at 1245-46
 
 (dissent).
 

 As the civil rights movement picked up steam, Duke Power "initiated a new policy
 
 as to hiring
 
 and advancement," requiring "a high school education or its equivalent ... for
 
 all new employees
 
 , except as to those in the Labor Department."
 
 Id
 
 . at 1228-29 (majority) (emphasis added). On the day Title VII took effect, Duke Power "added a further requirement for
 
 new employees
 
 "-the passage of "two professionally prepared aptitude tests, as well as to have a high school diploma."
 
 Griggs
 
 ,
 
 401 U.S. at 428
 
 ,
 
 91 S.Ct. 849
 
 (emphasis added). All existing employees (white and black) were grandfathered in. Only new Labor Department employees could still be hired
 without having to meet the requirements.
 
 Griggs
 
 ,
 
 420 F.2d at 1245-46
 
 (dissent).
 
 [3]
 

 Notwithstanding the new rule, if an "inside" position opened, the grandfathered white employees from "inside departments" without high school diplomas faced "no restriction on transfer from any of the inside departments to the other two inside departments."
 
 Id
 
 . at 1246 (Sobeloff, J., dissenting). It was "only the outsiders" (e.g., entirely new applicants or black Labor Department employees) who "must meet the questioned criteria."
 

 Id.
 

 This internal employee classification policy therefore put the black Labor Department employees in the same position as outside applicants. Consequently, "four years after the passage of Title VII, [the Duke power plant] look[ed] substantially like it did before 1965. The Labor Department [wa]s all black; the rest [wa]s virtually lily-white."
 

 Id.
 

 at 1247
 
 .
 

 Thus, it made no legal difference that the named class representatives were existing Labor Department employees challenging their restricted ability to transfer (read: apply) to the higher-paying units staffed with white employees. The Court's legal analysis was not limited to intra-company transfers:
 
 all
 
 new applicants and the Labor Department plaintiffs had to meet Duke's educational and testing standards to apply for non-janitorial open positions.
 
 Griggs,
 

 401 U.S. at 425-28
 
 ,
 
 91 S.Ct. 849
 
 .
 

 3.
 
 The Supreme Court's Analysis
 

 Thus it was neither accidental nor surprising that the Supreme Court framed the issue as whether an employer could require a high school education or passing a general intelligence test as "a condition of employment in or transfer to jobs,"
 

 id.
 

 at 426
 
 ,
 
 91 S.Ct. 849
 
 , signaling that the disparate-impact provision applied to both current employees and outside job applicants. The opinion also referred to the "
 
 hiring
 
 and assigning of employees" and to "tests or criteria for
 
 employment
 
 or promotion."
 

 Id.
 

 at 427, 431
 
 ,
 
 91 S.Ct. 849
 
 (emphasis added). Even more clearly, writing for the unanimous Court, Chief Justice Burger explained:
 

 Congress has now provided that tests or criteria for employment or promotion may not provide equality of opportunity merely in the sense of the fabled offer of milk to the stork and the fox. On the contrary, Congress has now required that the posture and condition
 
 of the job-seeker
 
 be taken into account. It has-to resort again to the fable-provided that the vessel in which the milk is proffered be one
 
 all seekers
 
 can use. The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation.
 

 Id.
 

 at 431
 
 ,
 
 91 S.Ct. 849
 
 (emphasis added). The Court framed the issue and its holding as applying to the use of aptitude and personality tests for
 
 both
 
 hiring and promotion decisions because those were the facts at issue. A decision that applied only to intra-Duke transfers, as the majority reads it now, would have missed the whole point of plaintiffs' case.
 

 Everyone understood that
 
 Griggs
 
 was the case testing disparate-impact coverage nationally. Given the class definition that included future job applicants, all judicial officers, parties, and amici understood that the stakes included protection for job applicants.
 

 [4]
 
 The amicus brief for the United States argued that the Court should hold that Title VII did not permit "an employer to require completion of high school or passage of certain general intelligence tests
 
 as a condition of eligibility for employment in
 
 , or transfer to, jobs formerly reserved only for whites" when these new requirements "disqualif[ied] Negroes at a substantially higher rate than whites" and were not "shown to be necessary for successful performance of the jobs."
 
 Griggs v. Duke Power Co.
 
 , Brief for the United States as Amicus Curiae at *2,
 
 1970 WL 122637
 
 (Sept. 4, 1970) (emphasis added). On the other side, the Chamber of Commerce cautioned that the "subject matter of the instant case-the utilization of educational or test requirements
 
 to select employees for hiring
 
 or promotion-is a matter of significant national concern." Brief Amicus Curiae on Behalf of the Chamber of Commerce of the United States of America at *1-2,
 
 1970 WL 122547
 
 (Oct. 14, 1970) (emphasis added).
 
 [5]
 

 Against this background, there can be no serious doubt that
 
 Griggs
 
 recognized disparate-impact protection for both current employees and job applicants. Even the Court's takeaway instructions for employers also addressed hiring:
 
 "
 
 Congress has now required that the posture and condition of the job-seeker be taken into account. ... If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited."
 
 401 U.S. at 431
 
 ,
 
 91 S.Ct. 849
 
 . And this was so despite the fact that the Court was confronted with the same textual differences in Title VII that we face in the ADEA today: the explicit reference to "hiring" in paragraph (a)(1), its omission in (a)(2), and the phrase "or otherwise adversely affect his status as an employee" in (a)(2).
 

 The majority in this case therefore has its facts exactly backwards in asserting that "[n]owhere in
 
 Griggs
 
 did the Court state that its holding extended to job applicants." Ante at 485. One cannot reasonably read hiring and job applicants out of the opinion. After
 
 Griggs
 
 , no competent lawyer would have counseled employers that they were prohibited from basing only intra-company transfers and promotions on "neutral" but non-job-related tests, but remained free to use the same tests when hiring new employees.
 

 B.
 
 Griggs' Aftermath and Title VII's 1972 Amendment
 

 1.
 
 Later Judicial Treatment of Griggs
 

 Unlike the majority here, courts, employers, and scholars took
 
 Griggs
 
 at its word that its holding was broad and not limited to intra-company transfers and promotions. Within two years, a "plethora of prominent and forceful federal court
 rulings-from district court judges to the Supreme Court but perhaps most pointedly from the courts of appeal-had already won ... sweepingly wide proactive employer compliance with Title VII's strictures." David J. Garrow,
 
 Toward a Definitive History of Griggs v. Duke Power Co
 
 .,
 
 67 Vand. L. Rev. 197
 
 , 230 (2014).
 

 Later Supreme Court decisions continued to read
 
 Griggs
 
 as governing hiring practices. E.g.,
 
 Albemarle Paper Co. v. Moody
 
 ,
 
 422 U.S. 405
 
 , 427,
 
 95 S.Ct. 2362
 
 ,
 
 45 L.Ed.2d 280
 
 (1975) ("Like the employer in
 
 Griggs
 
 ," the paper company defendant required "[a]pplicants for hire" to achieve certain test scores);
 

 id.
 

 at 425
 
 ,
 
 95 S.Ct. 2362
 
 (after
 
 Griggs
 
 , the "complaining party or class" must show "that the tests in question select
 
 applicants for hire
 
 or promotion in a racial pattern") (emphasis added);
 
 Dothard v. Rawlinson
 
 ,
 
 433 U.S. 321
 
 , 329,
 
 97 S.Ct. 2720
 
 ,
 
 53 L.Ed.2d 786
 
 (1977) (explaining that
 
 Griggs
 
 and
 
 Albemarle Paper
 
 "make clear that to establish a prima facie case of discrimination, a plaintiff need only show that the facially neutral standards in question select applicants for hire in a significantly discriminatory pattern");
 
 Connecticut v. Teal
 
 ,
 
 457 U.S. 440
 
 , 446,
 
 102 S.Ct. 2525
 
 ,
 
 73 L.Ed.2d 130
 
 (1982) (although requirements in
 
 Griggs
 
 "applied equally to white and black employees and applicants, they barred employment opportunities to a disproportionate number of blacks" and were therefore invalid);
 
 Texas Dep't of Housing
 
 , 135 S.Ct. at 2517 (explaining that
 
 Griggs
 
 "held that 'business necessity' constitutes a defense to disparate-impact claims" and did "not prohibit
 
 hiring
 
 criteria with a 'manifest relationship' to job performance") (emphasis added), quoting
 
 Griggs
 
 ,
 
 401 U.S. at 432
 
 ,
 
 91 S.Ct. 849
 
 . In short, lower federal courts have no business dismissing as careless dicta the
 
 Griggs
 
 references to job applicants.
 

 2.
 
 Title VII's 1972 Revision
 

 None of the Court's later references to
 
 Griggs
 

 '
 
 application to hiring even mention, let alone rely on, the fact that, as part of a major 1972 revision to Title VII, Congress also engaged in some statutory housekeeping and added an express reference to "applicants for employment" to the disparate-impact provision, § 2000e-2(a)(2). Pub. L. No. 92-261, § 8(a),
 
 86 Stat. 109
 
 (1972). But the majority, apparently without engaging with the facts of the
 
 Griggs
 
 litigation or the legislation, opines that the 1972 Amendment actually "reflected Congress's swift and clear desire to
 
 extend
 
 Title VII's disparate impact protection to job applicants." Ante at 486 (emphasis added). The facts show again that the majority has it exactly wrong.
 

 The year after
 
 Griggs
 
 , Congress enacted the Equal Employment Opportunity Act of 1972. It was a major bill designed to expand the powers of the EEOC and the scope of Title VII. But not every provision was important or controversial. The Act included this minor amendment not to change the law but to codify existing law as decided in
 
 Griggs
 
 .
 

 The 1964 Act had confined the EEOC's role to "investigation, persuasion, and conciliation," and unlike other major agencies, it "lacked the authority to issue cease-and-desist orders or to initiate legal action in the federal courts." Herbert Hill,
 
 The Equal Employment Opportunity Acts of 1964 and 1972
 
 , 2 Berkeley J. Emp. & Labor L. 1, 7-8 (1977). The Department of Justice, which
 
 did
 
 have authority to sue to enjoin employment discrimination, filed "few suits" and "obtain[ed] only minimal benefits for the complainants."
 
 Id.
 
 at 29. By the end of 1971, the year
 
 Griggs
 
 was decided, the EEOC was already "handicapped by a backlog of more than 23,000 unresolved complaints of discrimination"
 

 and was subject to withering criticism.
 
 Id
 
 . at 31-33. There was concern that Title VII's results had been "disappointing" and "in most respects, proved to be a cruel joke to those complainants who have in good faith turned toward the Federal Government [which] cannot compel compliance"; thus there was general resolve that "promises of equal job opportunity made in 1964 must be made realities in 1971."
 
 Id.
 
 at 47-48, quoting S. Rep. No. 415, 92nd Cong., 1st Sess. 8 (1971).
 

 The EEOC's limited powers were noted early. Efforts to strengthen it began almost immediately after the 1964 enactment.
 
 Id
 
 . at 32-33. It was clear, however, "that employers were vigorously opposed to any measure designed to increase the effectiveness of the law," and "[b]usiness interests conducted an intensive lobbying campaign against the various proposals to extend Title VII coverage, provide enforcement power to the EEOC, or strengthen the antidiscrimination statute in any way."
 
 Id.
 
 at 33.
 

 This years-long battle culminated in the 1972 Act. The Act's major provisions: authorized the EEOC "to initiate civil suits in federal district courts"; retained the then-controversial private right of action; created a new Office of General Counsel; expanded coverage to a larger number of private employers, most state and local government employees, and federal employees; and deleted the exemption for educational institutions.
 
 Id.
 
 at 50-58; Conf. Rep. on H.R. 1746, reprinted in 118 Cong. Rec. 7166, 7166-69 (March 6, 1972).
 

 3.
 
 Clarifying the Title VII Disparate-Impact Provision
 

 Along with these major changes, § 8(a) of the 1972 Act amended Title VII's disparate-impact language in § 2000e-2(a)(2) to add the reference to "applicants for employment." Pub. L. No. 92-261, § 8(a),
 
 86 Stat. 109
 
 (1972). The majority argues that, in light of this addition, concluding that
 
 Griggs
 
 had already covered job applicants "renders the 1972 amendment a meaningless act of the 92nd Congress." Ante at 486. Without considering the facts of the 1972 legislation as a whole, the majority has leaped to the wrong conclusion. It has overlooked the long-recognized difference between substantive and clarifying statutory amendments.
 

 First, Congress was well aware of
 
 Griggs
 
 . The Court's opinion was mentioned several times in the lengthy legislative history-always favorably and typically described in terms tracking the discussion of
 
 Griggs
 
 above. One House report quoted
 
 Griggs
 
 to emphasize the importance of disparate impact protections for "the job seeker" before noting that the "provisions of the bill are fully in accord with the decision of the Court." H.R. Rep. 92-899 at 21-22, reprinted in 118 Cong. Rec. 2156-57 (March 2, 1972), quoting
 
 Griggs
 
 ,
 
 401 U.S. at 431
 
 ,
 
 91 S.Ct. 849
 
 . Another House report described
 
 Griggs
 
 as a case "where the Court held that the use of employment tests as determinants of
 
 an applicant's
 
 job qualification ... was in violation of Title VII if such tests work a discriminatory effect in
 
 hiring
 
 patterns" without a "showing of an overriding business necessity." H.R. Rep. 92-238 at 8, reprinted at 1972 U.S.C.C.A.N. at 2144 (emphasis added).
 

 Amid the major policy changes in the 1972 Act, the addition of "applicants for employment" to the disparate-impact provision was a minor change, mentioned only briefly as incorporating existing law. The conference committee report to the Senate said that this addition was "merely declaratory of present laws." 118 Cong. Rec. at 7169. Congress noted its intention to "make it clear that discrimination against applicants for employment ... is an unlawful employment practice" under both
 clauses of Title VII's § 2000e-2(a). 118 Cong. Rec. at 7169. This conference committee report to the Senate was the final report on § 8(a) of H.R. 1746, which added "or applicants for employment" to the provision, see
 
 86 Stat. 103
 
 , 109 (approved March 24, 1972), essentially repeating an earlier Senate report that said this clarifying amendment "would merely be declaratory of present law." S. Rep. 92-415 at 43 (Oct. 28, 1971). Beyond these brief mentions, the addition of "applicants for employment" appeared not worthy of explanation at all.
 
 [6]
 

 Consider these sparse comments in context. The recognition of disparate-impact liability in
 
 Griggs
 
 had been controversial and hard-fought between civil rights advocates and employers. If Congress thought in 1972 that it was changing the law to
 
 extend
 
 disparate-impact protection to reach job applicants, that change surely would have been significant enough to mention in the detailed committee reports.
 

 And beyond Congress's silence about such a supposedly major change in the legislation, it beggars belief to think that employer groups would have let such an amendment pass without mention.
 
 [7]
 
 If, as the majority claims here,
 
 Griggs
 
 had actually left open whether job applicants were covered by Title VII's disparate impact provision, the Chamber and other employer groups would not have been silent. But they had already fought that battle, and they knew they had lost.
 

 The majority is right that courts often assume that statutory amendments are intended to change the law. Ante at 486, citing, e.g.,
 
 United States v. Quality Stores, Inc
 
 .,
 
 572 U.S. 141
 
 , 148,
 
 134 S.Ct. 1395
 
 ,
 
 188 L.Ed.2d 413
 
 (2014). But the majority overlooks the long-recognized reality that many statutory amendments are intended only to clarify existing law, not to change it. E.g., Singer, 1A Sutherland Statutes and Statutory Construction § 22:34 (7th ed. 2010).
 

 The distinction is relevant most often in disputes over whether to give an amendment retroactive effect. Substantive amendments that change the law are rarely given retroactive effect, while "clarifying" amendments are routinely given such effect. See, e.g.,
 
 United States ex rel. Garbe v. Kmart Corp
 
 .,
 
 824 F.3d 632
 
 , 642 (7th Cir. 2016) (collecting cases). In this case, the distinction has a dramatic effect on what the 1972 amendment tells us about the scope of
 
 Griggs
 
 and the proper interpretation of the original Title VII language, which is identical to the ADEA language we interpret here.
 

 How to tell when an amendment is substantive and when only clarifying? We explained in
 
 Garbe
 
 :
 

 In deciding whether an amendment is clarifying rather than substantive, we
 consider "[1] whether the enacting body declared that it was clarifying a prior enactment; [2] whether a conflict or ambiguity existed prior to the amendment; and [3] whether the amendment is consistent with a reasonable interpretation of the prior enactment and its legislative history."
 

 824 F.3d at 642
 
 , quoting
 
 Middleton v. City of Chicago
 
 ,
 
 578 F.3d 655
 
 , 663-64 (7th Cir. 2009).
 

 The evidence on all three of these factors shows that the 1972 amendment to the Title VII disparate-impact language was clarifying, not substantive. As shown above: (1) The enacting body announced that the new language only declared current law and was consistent with
 
 Griggs
 
 . (2) Before the 1972 amendment, disparate-impact coverage for outside job applicants had been established in
 
 Griggs
 
 ; that coverage was certainly no worse than ambiguous. (3) The 1972 amendment was "consistent with a reasonable interpretation of the prior enactment and its legislative history." That's exactly how the Supreme Court had read the language a year earlier in
 
 Griggs
 
 and how the decision was described in the 1972 amendment's legislative history.
 

 In short, the facts refute the majority's unsupported claim that the 1972 amendment showed Congress's "swift and clear desire to extend Title VII's disparate impact protection to job applicants." Ante at 486. Without evidence that Congress was "extending" Title VII, there is no foundation here for the majority's further inference that Congress in 1972 was silently endorsing a narrower interpretation of identical language in the ADEA. The ADEA was never mentioned in the larger 1972 Act itself or in the conference report describing it. The 1972 Act amended only provisions of the 1964 Act and provides no support for the majority's narrower interpretation of the ADEA.
 

 C.
 
 Griggs and Smith v. City of Jackson
 

 In a further effort to diminish
 
 Griggs
 
 , the majority offers what it calls a "commonsense observation." If it was so clear that
 
 Griggs
 

 '
 
 Title VII analysis should apply to the ADEA's identical disparate-impact language, then it is "very difficult to explain why it took the Supreme Court 34 years to resolve whether anyone-employee or applicant-could sue on a disparate impact theory under the ADEA, as it did in
 
 Smith v. City of Jackson
 
 ,
 
 544 U.S. 228
 
 [
 
 125 S.Ct. 1536
 
 ,
 
 161 L.Ed.2d 410
 
 ] (2005)." Ante at 485. Yet again, the majority ignores the facts. It's easy to explain. The Court's opinion in
 
 Smith
 
 did so.
 

 After emphasizing Title VII and the ADEA's "identical text" and "striking" contextual parallels,
 
 Smith
 
 noted somewhat bemusedly: "Indeed, for over two decades after our decision in
 
 Griggs
 
 , the Courts of Appeals uniformly interpreted the ADEA as authorizing recovery on a 'disparate-impact' theory in appropriate cases."
 
 544 U.S. at
 
 233-37 & n.5,
 
 125 S.Ct. 1536
 
 . Without a circuit split over identical statutory language, there had been no need for the Supreme Court to step in.
 

 In
 
 Hazen Paper Co. v. Biggins
 
 ,
 
 507 U.S. 604
 
 , 610,
 
 113 S.Ct. 1701
 
 ,
 
 123 L.Ed.2d 338
 
 (1993), however, the Court observed that "we have never decided whether a disparate impact theory of liability is available under the ADEA" and "we need not do so here."
 

 Id.
 

 at 610
 
 ,
 
 113 S.Ct. 1701
 
 . A concurring opinion in
 
 Hazen Paper
 
 emphasized that "nothing in the Court's opinion should be read as incorporating in the ADEA context the so-called 'disparate impact' theory of Title VII of the Civil Rights Act of 1964" as "there are substantial arguments that it is improper to carry over
 disparate impact analysis from Title VII to the ADEA."
 

 Id.
 

 at 618
 
 ,
 
 113 S.Ct. 1701
 
 . Those comments finally led to a circuit split on the question.
 
 [8]
 

 The Supreme Court then granted review in
 
 Smith
 
 to resolve the circuit split.
 
 [9]
 

 Smith
 
 endorsed the view that had been uniform before
 
 Hazen Paper
 
 : the ADEA recognizes disparate-impact claims. See
 
 544 U.S. at
 
 237 n.8, 240,
 
 125 S.Ct. 1536
 
 .
 

 In fact,
 
 Smith
 
 cited with approval cases allowing disparate-impact ADEA claims by job applicants and others who did not have, according to the majority here, "status as an employee."
 
 Id
 
 . at 237 n.8,
 
 125 S.Ct. 1536
 
 , citing
 
 Faulkner v. Super Valu Stores, Inc
 
 .,
 
 3 F.3d 1419
 
 , 1423-24 (10th Cir. 1993) (laid-off warehouse workers applying for jobs with new buyer of warehouse);
 
 Wooden v. Board of Educ. of Jefferson Cty.
 
 ,
 
 931 F.2d 376
 
 , 377 (6th Cir. 1991) (applicant for full-time teaching positions).
 
 [10]
 

 Smith
 
 thus seemed to end the questioning of
 
 Griggs
 

 '
 
 relevance to the ADEA's disparate-impact provision. See, e.g.,
 
 Meacham v. Knolls Atomic Power Lab.
 
 ,
 
 554 U.S. 84
 
 , 95,
 
 128 S.Ct. 2395
 
 ,
 
 171 L.Ed.2d 283
 
 (2008) (confirming that § 623(a)(2) covers employment practices with disparate impacts on older workers);
 
 Texas Dep't of Housing
 
 , 135 S.Ct. at 2518.
 

 Smith
 
 did not end the long tug-of-war between employers and workers over competing interpretations of civil rights legislation. The authors of
 
 Hazen Paper
 
 concurred in
 
 Smith
 
 but planted the seed of today's dispute. Justice O'Connor, joined by Justices Kennedy and Thomas, concurred in the judgment "on the ground that disparate impact claims are not cognizable."
 
 Smith
 
 ,
 
 544 U.S. at 248
 
 ,
 
 125 S.Ct. 1536
 
 . A primary reason, they argued, not to defer to the EEOC's regulation that treated § 623(a)(2) as covering disparate-impact claims, was because the regulation also read the provision to cover employers' hiring practices-and thus protected applicants for employment.
 

 Id.
 

 at 266
 
 ,
 
 125 S.Ct. 1536
 
 . The concurrence pointed to the difference in language between § 623(a)(1)
 

 and (a)(2) and asserted that "only" § 623(a)(1) protects applicants and therefore the EEOC regulation "must" have read a disputed ADEA provision to "provide a defense against claims under [ § 623(a)(1) ]-which unquestionably permits only disparate treatment claims."
 

 Id.
 

 Obviously that view did not carry the day in
 
 Smith
 
 .
 
 [11]
 

 Still, here we are. The resources that employers deployed in
 
 Smith
 
 to try to avoid all ADEA disparate-impact claims have been repurposed. Now they are deployed in a new campaign to show that the "plain text" of § 623(a)(2) permits employers to maintain irrational policies that disadvantage older individuals so long as those individuals have not yet been hired by the employer. Today's majority is not the first circuit to bite on this argument. The Eleventh Circuit has beaten us to it, ironically producing four opinions on the "plain" meaning of the text.
 
 Villarreal v. R.J. Reynolds Tobacco Co.
 
 ,
 
 839 F.3d 958
 
 (11th Cir. 2016) (en banc). We should not adopt this deliberately naïve and ahistorical approach.
 

 III.
 
 Practical Consequences and Statutory Purpose
 

 The text and precedent favor the view that job applicants may bring disparate-impact claims under the AEDA. In construing ambiguous statutory language, it also makes sense to consider the practical consequences of the different readings of § 623(a)(2) and how they fit with the overall statute's design and purpose. E.g.,
 
 Graham County
 
 ,
 
 559 U.S. at 299-301
 
 ,
 
 130 S.Ct. 1396
 
 (considering practical consequences when determining better reading of statute);
 
 Dewsnup v. Timm
 
 ,
 
 502 U.S. 410
 
 , 416-20,
 
 112 S.Ct. 773
 
 ,
 
 116 L.Ed.2d 903
 
 (1992) (same);
 
 Burwell
 
 , 135 S.Ct. at 2489 (same). Those considerations weigh heavily against the majority here.
 

 A simple hypothetical shows how improbable and arbitrary the majority's reading is. Suppose the majority is correct that § 623(a)(2) applies only to current employees. Imagine two applicants for the defendant's senior counsel position here. Both are in their fifties, and both have significantly more than seven years of relevant legal experience. One is Kleber, who does not currently have a job with the defendant. The other already works for the defendant but wants a transfer or promotion to the senior counsel position. Both are turned down because they have more than the maximum seven years of experience. According to the majority, the inside applicant can sue for a disparate-impact violation, but the outside one cannot.
 

 That result is baffling, especially under a statute with the stated purpose "to prohibit arbitrary age discrimination in employment."
 
 29 U.S.C. § 621
 
 (b). And the majority's view depends entirely on the assumption that the statutory phrase "otherwise adversely affect his status as an employee" cannot possibly be applied to an individual who is, because of the challenged employment practice, completely
 
 denied any status
 
 as an employee. I cannot imagine that when the ADEA was enacted, "a reasonable person conversant with applicable social conventions would have understood" the ADEA as drawing the line the majority adopts here. See John F. Manning,
 
 What Divides Textualists from Purposivists?
 
 ,
 
 106 Colum. L. Rev. 70
 
 , 77 (2006) ; accord,
 
 In re Sinclair
 
 ,
 
 870 F.2d 1340
 
 , 1342 (7th Cir. 1989) (legislative
 history may provide context for statutory language and "may be invaluable in revealing the setting of the enactment and the assumptions its authors entertained about how their words would be understood").
 

 Under the majority's interpretation, still further arbitrary line-drawing will now be needed. Suppose the applicant is currently employed by a sister subsidiary of the employer. Does she have the right "status as an employee" so that she can assert a disparate impact claim? Should the answer depend on some sort of corporate veil-piercing theory? Or suppose the applicant was recently laid off by the employer and challenges its failure to recall her. Or suppose the applicant currently has a position through a temporary employment agency, working side-by-side with employees. I see no arguable reason to exclude any of these applicants from the disparate-impact protection of paragraph (a)(2).
 

 Neither the majority nor the defendant or its amici have offered a reason why Congress might have chosen to allow the inside applicant but not the outside applicant to assert a disparate-impact claim. I can't either. Faced with the arbitrary consequences of drawing this line half a century after Congress drafted the legislation, the majority shrugs and says tautologically that it's "the province of Congress to choose where to draw legislative lines and to mark those lines with language." Ante at 488.
 
 [12]
 

 Of course, Congress can and often does draw arbitrary lines when it wants to do so. When it does, courts enforce those lines, absent constitutional problems. See, e.g.,
 
 Stephens v. Heckler
 
 ,
 
 766 F.2d 284
 
 , 286 (7th Cir. 1985) (Congress can dictate outcomes even though "there is no shortage of arbitrariness in disability cases");
 
 First Chicago NBD Corp. v. Comm'r of Internal Revenue
 
 ,
 
 135 F.3d 457
 
 , 460 (7th Cir. 1998) ("arbitrariness is everywhere in the tax code, so that an approach to interpretation that sought to purge the arbitrary from the code would be quixotic"). But when the statutory language is at worst ambiguous, see above at 490-96, courts should not embrace such arbitrary results so at odds with the stated statutory purpose. See, e.g.,
 
 Graham County
 
 ,
 
 559 U.S. at 283, 299-301
 
 ,
 
 130 S.Ct. 1396
 
 (False Claims Act) ;
 
 Gustafson v. Alloyd Co., Inc.
 
 ,
 
 513 U.S. 561
 
 , 564, 578,
 
 115 S.Ct. 1061
 
 ,
 
 131 L.Ed.2d 1
 
 (1995) (Securities Act of 1933); see also, e.g.,
 
 Kennedy v. Chemical Waste Mgmt., Inc.
 
 ,
 
 79 F.3d 49
 
 , 51 (7th Cir. 1996) (Americans with Disabilities Act);
 
 Martin v. Luther
 
 ,
 
 689 F.2d 109
 
 , 114 (7th Cir. 1982) (reaching conclusion about parole revocation "supported by common sense and an assessment of the practical consequences,
 which naturally guide our interpretation of legislative enactments").
 

 The majority's arbitrary line undermines the stated purpose of the statute. Statutory purpose here is not a matter of judicial inference but of statutory declaration in the text enacted by both Houses of Congress and signed by the President. Congress enacted the ADEA to address unfair employment practices that make it harder for older people to
 
 find
 
 jobs.
 
 29 U.S.C. § 621
 
 (a). That purpose was reflected in a variety of statutory provisions, as noted above. In addition to the statute's specific reliance on its stated purpose, we know from the 1965 Department of Labor report that was the catalyst for the ADEA-known as the Wirtz Report-that Congress had job applicants very much in mind. Report of the Secretary of Labor,
 
 The Older American Worker: Age Discrimination in Employment
 
 (June 1965), reprinted in U.S. Equal Employment Discrimination in Employment Act (1981), Doc. No. 5 (the Wirtz Report).
 

 Under the majority's reading of § 623(a)(2), the ADEA's protection of the "employment opportunities" of "any individual" prohibits employment practices with disparate impacts in firing older workers and in promoting, paying, and managing them,
 
 but not in hiring them!
 
 Congress was concerned about all of these forms of discrimination. Wirtz Report at 21-22; see also
 
 Employment of Older Workers
 
 , 111 Cong. Rec. 15518, 15518-19 (1965) (describing Wirtz Report as urging "a clear, unequivocal national policy against hiring that discriminates against older workers" and referring to "job openings," and "applicants over 45");
 
 EEOC v. Wyoming
 
 ,
 
 460 U.S. 226
 
 , 231,
 
 103 S.Ct. 1054
 
 ,
 
 75 L.Ed.2d 18
 
 (1983) (observing that Wirtz Report concluded "arbitrary age discrimination was profoundly harmful ... [because] it deprived the national economy of the productive labor of millions ... [and] substantially increased costs in unemployment insurance and federal Social Security benefits" for older workers who could not land a job).
 

 A central goal-arguably the most central goal-of the statute was to prevent age discrimination
 
 in hiring.
 
 Congress and the Wirtz Report explained that the problem stemmed not just from explicit bias against older workers (i.e., disparate treatment), but also from "[a]ny formal employment standard" neutral on its face yet with adverse effects on otherwise qualified older applicants. Wirtz Report at 3; see also
 
 Smith
 
 ,
 
 544 U.S. at
 
 235 n.5,
 
 125 S.Ct. 1536
 
 . Those neutral standards and other thoughtless or even well-intentioned employment practices can be addressed only with a disparate-impact theory under § 623(a)(2). The report made clear that the older people who suffered the disparate impact from such practices were those trying to get hired in the first place. The report explained that despite the beneficial effects of such policies, "ironically, they sometimes have tended to push still further down the age at which employers begin asking
 
 whether or not a prospective employee is too old to be taken on
 
 ." Wirtz Report at 2 (emphasis added).
 

 Against this evidence of contemporary understandings, the majority offers no plausible policy reasons, but only its wooden and narrow textual interpretation, which is anything but inevitable. Wearing blinders that prevent sensible interpretation of ambiguous statutory language, the majority adopts the improbable view that the Act outlawed employment practices with disparate impacts on older workers, but excluded from that protection everyone not already working for the employer in question.
 

 * * *
 

 Given the statutory language in § 623(a)(2), the interpretation of that language in
 
 Smith
 
 and identical language in
 
 Griggs
 
 , the practical consequences of the interpretive choice, and the absence of any policy rationale for barring outside job applicants from raising disparate-impact claims, we should reject the improbable and arbitrary distinction adopted by the majority. We should hold that outside job applicants like Kleber may bring disparate-impact claims of age discrimination. I respectfully dissent.
 

 Justice Scalia joined Parts I, II, and IV of the
 
 Smith
 
 opinion by Justice Stevens and wrote that he also agreed with Justice Stevens's reasoning in Part III.
 
 544 U.S. at 243
 
 ,
 
 125 S.Ct. 1536
 
 . I therefore treat all parts of the
 
 Smith
 
 opinion by Justice Stevens as authoritative without repeatedly citing Justice Scalia's concurrence as well.
 

 Judge Martin's dissent in
 
 Villarreal v. R.J. Reynolds Tobacco Company
 
 collected several examples.
 
 839 F.3d 958
 
 , 983 & n.2 (11th Cir. 2016) (en banc), citing
 
 Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co
 
 .,
 
 547 U.S. 651
 
 , 656,
 
 126 S.Ct. 2105
 
 ,
 
 165 L.Ed.2d 110
 
 (2006) (bankruptcy claimant could be "denied priority status");
 
 Chandris, Inc. v. Latsis
 
 ,
 
 515 U.S. 347
 
 , 372,
 
 115 S.Ct. 2172
 
 ,
 
 132 L.Ed.2d 314
 
 (1995) (maritime worker could "be denied seaman status");
 
 McNary v. Haitian Refugee Ctr., Inc
 
 .,
 
 498 U.S. 479
 
 , 496,
 
 111 S.Ct. 888
 
 ,
 
 112 L.Ed.2d 1005
 
 (1991) (person trying to do seasonal work could be "denied SAW [special agricultural worker] status");
 
 Clark v. Gabriel
 
 ,
 
 393 U.S. 256
 
 , 264,
 
 89 S.Ct. 424
 
 ,
 
 21 L.Ed.2d 418
 
 (1968) (draft registrant could be "denied CO [conscientious objector] status").
 

 We have also used this "denial of status" phrasing in a variety of contexts.
 
 Bell v. Kay
 
 ,
 
 847 F.3d 866
 
 , 868 (7th Cir. 2017) (plaintiff objected to "the order denying him pauper status");
 
 McMahon v. LVNV Funding, LLC
 
 ,
 
 807 F.3d 872
 
 , 875 (7th Cir. 2015) (observing that "the denial of class status is likely to be fatal to this litigation");
 
 Moranski v. General Motors Corp
 
 .,
 
 433 F.3d 537
 
 , 538 (7th Cir. 2005) (analyzing "denial of Affinity Group status" affecting a proposed group of employees);
 
 Hileman v. Maze
 
 ,
 
 367 F.3d 694
 
 , 697 (7th Cir. 2004) (plaintiff alleged injury resulting "from the denial of her status" as candidate in local election);
 
 Resser v. Comm'r of Internal Revenue
 
 ,
 
 74 F.3d 1528
 
 , 1532 (7th Cir. 1996) (appealing Tax Court's "denial of 'innocent spouse' status");
 
 Williams v. Katz
 
 ,
 
 23 F.3d 190
 
 , 191 (7th Cir. 1994) (spurned intervenor permanently "denied the status of a party" in litigation);
 
 Lister v. Hoover
 
 ,
 
 655 F.2d 123
 
 , 124-25 (7th Cir. 1981) (plaintiffs "who were denied resident status and the accompanying reduced tuition" at a state university). In all of these cases, "status" was surely "adversely affected," to use the phrasing of § 623(a)(2).
 

 To be precise, the coal handling department was the one unit staffed by white employees that had been subject to the high school diploma requirement for transfer. The aptitude tests were offered at the coal employees' request as "a means of escaping from that department" and were then made available to employees in the Labor Department.
 
 Griggs
 
 ,
 
 420 F.2d at
 
 1229 ;
 
 Griggs
 
 ,
 
 401 U.S. at 427-28
 
 ,
 
 91 S.Ct. 849
 
 .
 

 Judge Sobeloff's dissent in the Fourth Circuit was prescient: "The decision we make today is likely to be as pervasive in its effect as any we have been called upon to make in recent years."
 
 Griggs
 
 ,
 
 420 F.2d at 1237
 
 . He continued: "The statute is unambiguous" in prohibiting " 'objective' or 'neutral' standards that favor whites but do not serve business needs."
 

 Id.
 

 at 1238
 
 . After all, "[n]o one can doubt that [a] requirement would be invalid" if an employer issued the "neutral" criteria that "
 
 all applicants for employment
 
 shall have attended a particular type of school," but "the specified schools were only open to whites" and "taught nothing of particular significance to the employer's needs."
 
 Id.
 
 (emphasis added).
 

 The Chamber of Commerce attorney also talked about hiring in oral argument: "We're talking about objective means of choosing which employee should fit in to a particular job or
 
 which employee should be hired in the first place
 
 ...." Transcript of Oral Argument,
 
 Griggs
 
 ,
 
 401 U.S. 424
 
 ,
 
 91 S.Ct. 849
 
 (No. 70-124), available at http://www.oyez.org/cases/1970-1979/1970/1970_124 (emphasis added).
 

 The House version of the conference committee report contained the text of § 8(a) but provided no explanation. See H.R. Rep. 92-899 at 8, 19-20, reprinted in 92nd Cong., 118 Cong. Rec. 6643, 6645, 6648 (March 2, 1972). An earlier House report mentioned § 8(a) only in passing in the section-by-section analysis. See
 
 id
 
 . at 20-22, 30, reprinted in 1972 U.S.C.C.A.N. at 2155-57, 2165.
 

 Just months earlier, the Chamber of Commerce's attorney had argued to the
 
 Griggs
 
 Court:
 

 This case is one which is a vital concern to employers, both small and large throughout the United States. In today's labor market, there are often many applicants for the job, just as there are many employees who desire to be promoted [and] the employer must make a choice ... often a difficult one.
 

 Transcript of Oral Argument,
 
 Griggs
 
 ,
 
 401 U.S. 424
 
 ,
 
 91 S.Ct. 849
 
 (No. 70-124), available at http://www.oyez.org/cases/1970-1979/1970/1970_124.
 

 A year after
 
 Hazen Paper
 
 , we held that the ADEA did not permit any disparate-impact liability.
 
 EEOC v. Francis W. Parker School
 
 ,
 
 41 F.3d 1073
 
 , 1075 (7th Cir. 1994). In rejecting the reasoning in
 
 Griggs
 
 , we mistakenly emphasized the textual difference between Title VII and the ADEA, see
 
 41 F.3d at 1077-78
 
 , overlooking the fact that
 
 Griggs
 
 , decided in 1971, considered exactly the same disparate-impact language that is in the ADEA. Inexplicably, the majority now repeats the same error: "We underscored this exact difference 14 years ago in our opinion in
 
 Francis W. Parker
 
 , and we do so again today"-"The 'mirror' provision in the ADEA omits from its coverage, 'applicants for employment.' " Ante at 487. This was simply not so in
 
 Griggs
 
 .
 

 The Chamber of Commerce again weighed in, arguing against extending
 
 Griggs'
 
 disparate-impact analysis to the ADEA. The Chamber had still not, however, hit upon the textual reading argued here, that job applicants should be excluded from the ADEA's disparate-impact provision. Brief of Amicus Curiae Chamber of Commerce of the United States of America in Support of Respondents,
 
 2004 WL 1905736
 
 at *15 (Aug. 23, 2004) (conceding that the reasoning of
 
 Griggs
 
 , which prohibited "segregation of departments by race," "applies equally to the ADEA, which sought to eliminate these kinds of express age 'limits' and 'classifications,' which frequently were used against older workers. E.g. Labor Report at 21 (discussing 'persistent and widespread use of age limits in hiring').").
 

 Other earlier cases not cited in
 
 Smith
 
 had also allowed disparate-impact age claims by job applicants. E.g.,
 
 Lowe v. Commack Union Free School Dist.
 
 ,
 
 886 F.2d 1364
 
 , 1365-70 (2d Cir. 1989) (laid-off teachers later re-applied but were not hired);
 
 Geller v. Markham
 
 ,
 
 635 F.2d 1027
 
 , 1030 (2d Cir. 1980) (upholding jury award for teacher applicant temporarily hired, then passed over in favor of younger applicant due to "cost-cutting policy");
 
 Leftwich v. Harris-Stowe State College
 
 ,
 
 702 F.2d 686
 
 , 689-90 (8th Cir. 1983) (faculty member forced to re-apply for job and not hired).
 

 Justice Scalia's concurrence specifically rejected that reasoning as to the EEOC regulation and, since the line drawing between applicants and current employees was beyond the scope of
 
 Smith
 
 itself, expressed his agnosticism on that issue.
 
 Smith
 
 ,
 
 544 U.S. at
 
 246 n.3,
 
 125 S.Ct. 1536
 
 .
 

 Far from offering a reason, defendant defiantly claims that just because Congress has drawn the line between "employees" and "applicants" "for no good reason, and that the line might create hypothesized anomalies, [that] is no reason to disregard Congress' words." Petition for Rehearing En Banc, Dkt. 43 at 10 (May 10, 2018). The Chamber of Commerce amicus brief feints toward ascribing intent to Congress, arguing that foreclosing applicants from recourse was "[o]ne of the careful lines drawn by Congress" because the ADEA "strikes a careful balance between prohibiting irrational barriers to employment of older workers and preserving employers' ability to adopt sound hiring policies." Dkt. 19 at 3, 1 (Sept. 6, 2018). There is no evidence of such a deliberate choice in § 623(a)(2). Under the Chamber's theory, that "balance" is shifted entirely in employers' favor. An employer can set wildly irrational hiring criteria-such as requiring Twitter, Instagram, and Snapchat proficiency for an entry-level position at a fast-food joint, which would likely have a large disparate impact on older workers. As long as that position is not open to internal applicants, that would be a highly effective yet immune "barrier to employment of older workers." That's not a "careful line." It's nonsense.